[Cite as *State v. Pleban*, 2011-Ohio-3254.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 10CA009789 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| RONALD H. PLEBAN | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 09CR077940 |

DECISION AND JOURNAL ENTRY

Dated: June 30, 2011

CARR, Presiding Judge.

**{¶1}** Appellant, Ronald Pleban, appeals his conviction out of the Lorain County Court of Common Pleas. This Court affirms.

I.

**{¶2}** On April 23, 2009, Pleban was indicted on one count of inducing panic in violation of R.C. 2917.31(A)(3), a felony of the fourth degree; and one count of aggravated menacing in violation of R.C. 2903.21(A), a misdemeanor of the first degree. Pleban pleaded not guilty to the charges at arraignment. The State moved to amend count one of the indictment (inducing panic) to identify the offense of aggravated menacing as the predicate offense. The matter was scheduled for a trial to the bench. At the conclusion of the State's case-in-chief, the State reminded the trial court of the pending motion to amend the indictment. Pleban agreed that the amendment was proper and asserted he had no objection. The trial court granted the State's motion to amend.

{¶3}   At the conclusion of trial, the trial court allowed the parties to submit trial briefs in lieu of closing arguments.  On December 9, 2009, the trial court issued a judgment entry in which it found Pleban guilty of inducing panic, as charged, and guilty of attempted aggravated menacing in violation of R.C. 2923.02/2903.21(A), a misdemeanor of the second degree.  The trial court referred the matter for a presentence investigation and report and ordered the State to present any claim for restitution at the time of imposition of sentencing.  A restitution and sentencing hearing was held on February 18, 2010.  The trial court sentenced Pleban to community control and ordered him to make restitution to Lorain County in the amount of $9,855.46.

{¶4}   Pleban filed a timely appeal, in which he raises three assignments of error.

II.

**ASSIGNMENT OF ERROR I**

"PLEBAN'S CONVICTION FOR INDUCING PANIC WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, AND MUST BE REVERSED."

{¶5}   Pleban argues that his conviction for inducing panic was not supported by sufficient evidence.  Specifically, he argues that (1) the State failed to present sufficient evidence to prove aggravated menacing, the predicate offense on which the charge of inducing panic was premised; (2) the State failed to present sufficient evidence that Pleban committed the predicate offense with reckless disregard of the likelihood that its commission would cause serious public inconvenience or alarm; and (3) the State failed to present sufficient evidence that Pleban's actions caused economic harm in an amount of five thousand dollars or more but less than one hundred thousand dollars.  This Court disagrees.

{¶6}   The law pertaining to a challenge to the sufficiency of the evidence is well settled:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Galloway* (Jan. 31, 2001), 9th Dist. No. 19752.

The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *State v. Walker* (Dec. 12, 2001), 9th Dist. No. 20559; see, also, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390.

{¶7} Pleban was convicted of inducing panic in violation of R.C. 2917.31(A)(3), which states: "No person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by *** [c]ommitting any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm." R.C. 2901.22(C) provides that "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

Predicate Offense

{¶8} The trial court found Pleban guilty of attempted aggravated menacing as the predicate offense underlying the charge of inducing panic. Pleban argues that, because he was charged with aggravated menacing, his due process rights were violated when the trial court convicted him of a different crime, specifically, attempted aggravated menacing. His argument is not well taken.

{¶9} Both R.C. 2945.74 and Crim.R. 31(C) provide, in relevant part, that the trier of fact may find a defendant not guilty of a charged offense, but guilty of an attempt to commit the charged offense if such attempt is an offense at law. It is well established that attempts to commit charged crimes constitute one of the three types of lesser offenses a trier of fact may consider when determining a defendant's guilt, the other two types being inferior degrees of the indicted offense and lesser included offenses. *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, at ¶10, citing *State v. Deem* (1988), 40 Ohio St.3d 205, paragraph one of the syllabus, construing R.C. 2945.74 and Crim.R. 31(C). The *Deem* court explained: "Attempts, as criminal offenses, arise from R.C. 2923.02 and need not be included within the indictment for the completed offense. Rather, if during the course of trial the defendant presents sufficient evidence that his conduct was unsuccessful in constituting the indicted offense, an instruction to the jury on attempt would be proper." *Deem*, 40 Ohio St.3d at 208. Accordingly, because attempt crimes are subsumed within indicted offenses, Pleban's conviction for attempted aggravated menacing did not violate his due process rights where he was charged with aggravated menacing.

{¶10} Pleban was charged with aggravated menacing in violation of R.C. 2903.21(A) which states that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." The attempt statute, R.C. 2923.02, states that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense." R.C. 2901.22(B) states: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a

certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.01(A)(5) defines "serious physical harm to persons" as any of the following:

"(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

"(b) Any physical harm which carries a substantial risk of death;

"(c) Any physical harm which involves some permanent incapacity, whether partial or total, or which involves some temporary, substantial incapacity;

"(d) Any physical harm which involves some permanent disfigurement, or which involves some temporary, serious disfigurement;

"(e) Any physical harm which involves acute pain of such duration as to result in substantial suffering, or that involves any degree of prolonged or intractable pain."

R.C. 2901.01(A)(6) defines "serious physical harm to property" as physical harm which either:

"(a) Results in substantial loss to the value of the property, or requires a substantial amount of time, effort, or money to repair or replace;

"(b) Temporarily prevents the use or enjoyment of the property, or substantially interferes with its use or enjoyment for an extended period of time."

{¶11} The State amended the charge immediately prior to trial to allege that Pleban's wife Karen was the intended victim of aggravated menacing.

{¶12} Susan Neely, communications officer from the Lorain County Sheriff's Department ("LCSD"), testified that she received a phone call from Karen Pleban on February 25, 2009, regarding her husband. The recorded call was played in court. Mrs. Pleban reported to the LCSD that she had left her husband that day because of his ongoing erratic behavior and that he was now threatening to shoot and kill himself and the couple's two dogs. She requested a welfare check on her husband because of his behavior, threats, and compromised health.

Although Mrs. Pleban agreed to meet the deputies at her home to let them enter, she made clear that she was not willing to enter the home herself.

{¶13} Deputy Debra Eskut of the LCSD testified that she is a trained hostage negotiator with experience in suicide intervention and mental health counseling. She testified that she was dispatched to Pleban's home regarding an older male who threatened to harm himself. She testified that Mrs. Pleban stayed at the scene all night and never asked law enforcement to abandon their efforts. Deputy Eskut testified that Mrs. Pleban appeared upset, stressed, and worried throughout the incident.

{¶14} Deputy Eskut testified that she negotiated with Pleban throughout the night by telephone and that those calls were recorded until shortly after 11:30 p.m. when her phone went dead and she was forced to communicate with Pleban through the on-site command vehicle rather than her cruiser and dispatch. The recordings of her conversations with Pleban until they could no longer be recorded were admitted into evidence. The recordings evidence Pleban's assertion that he was despondent and intended to shoot and kill himself and the couple's two dogs, as earlier reported by Mrs. Pleban to the LCSD dispatch center. Pleban informed Deputy Eskut that one of the dogs belonged to his wife and that the couple thought of the dogs as their children.

{¶15} Sergeant Daniel Ashdown of the LCSD testified that he responded to a "stand-off situation" near Pleban's home. He testified that his unit relieved one of the perimeter units at 11:15 p.m. at the intersection of Woodhill and Galaxy, where Mrs. Pleban also remained all night. The sergeant testified that Mrs. Pleban never requested that law enforcement call off their efforts.

{¶16} Captain John Reiber, the director of law enforcement for the LCSD, testified that he responded to the area of Pleban's home within his capacity as co-commander of the Lorain County SWAT team. He testified that he was located at the intersection of Woodhill and Galaxy, where Mrs. Pleban remained. He testified that Mrs. Pleban never requested that law enforcement call off their efforts, nor did she express any desire during the incident to speak with her husband.

{¶17} Rose Temas testified for the defense. She testified that she is Karen Pleban's sister and that Karen contacted her on February 25, 2009, over concerns for her husband's well being. Ms. Temas testified that her sister was very concerned because Pleban told her he was planning to hurt himself and the couple's dogs. Ms. Temas testified that her sister asserted that she was not going back home because her husband had been drinking and "she didn't know what to expect." Ms. Temas testified that she spoke with Pleban on the phone and he threatened to hurt the couple's dogs and do whatever he could to get his wife to return home.

{¶18} Karen Pleban testified in her husband's defense. She testified that she left her husband on February 25, 2009, because his on-going mood swings made him unpredictable and she "couldn't take it anymore." Mrs. Pleban testified that her husband threatened to kill himself, as well as the couple's dogs, if she would not agree to return to him. She admitted that there was one time that evening that she was concerned for the dogs, but she testified that she otherwise did not take his threats seriously. Mrs. Pleban testified that she believed that her husband's threats were just a way to compel her to return home. She asserted, however, that law enforcement should have recognized from their involvement with Pleban that night that he was "not right," "not balanced," "unstable," and should have been transported for psychiatric intervention at Nord Center.

{¶19} Reviewing the evidence in a light most favorable to the State, this Court concludes that any rational trier of fact could have found the essential elements of attempted aggravated menacing were proved beyond a reasonable doubt. See *Jenks* at paragraph two of the syllabus. The State presented evidence that Pleban made threats to his wife while he was in a depressed and unstable state that he was going to shoot himself and the couple's pet dogs. Pleban, as Karen's husband, was a member of the alleged victim's immediate family. The evidence demonstrated that one of the dogs was the personal property of Mrs. Pleban. Several witnesses testified that Mrs. Pleban seemed very concerned for her husband's welfare and state of mind, and that she never requested that law enforcement terminate their efforts to talk Pleban out of the house safely. Although Mrs. Pleban testified that she did not believe that her husband would follow through with his threats, she admitted that she had concern for the safety of the dogs on one occasion during the incident. Under the circumstances, there was sufficient evidence to establish that Pleban attempted to knowingly cause his wife to believe that he would cause serious physical harm by means of a hand gun to both himself and the couple's dogs. Accordingly, the State presented sufficient evidence to establish that Pleban committed attempted aggravated menacing, the predicate offense on which the charge of inducing panic was premised.

Reckless Disregard of the Likelihood of Serious Public Inconvenience or Alarm

{¶20} Pleban argues that the State presented insufficient evidence to establish that he acted with reckless disregard of the likelihood that his attempt to cause his wife to believe that he would shoot himself and the couple's dogs would likely cause serious public inconvenience or alarm. This Court disagrees.

{¶21} Mrs. Pleban testified that she told her husband that she was going to call the sheriff's department after he threatened to harm himself. She testified that Pleban told her that they would simply find him and the dogs dead. Pleban's comments and subsequent failure to answer his phone caused his wife to contact the sheriff's department and request a welfare check. Although Mrs. Pleban informed the dispatcher about Pleban's heart condition, she also discussed his threats and recent instability and erratic behavior.

{¶22} The 2-3-hours long recording of the telephone communications between Deputy Eskut and Pleban evidence that he was aware that Ms. Eskut was an employee of the LCSD and that law enforcement was involved in the situation. Deputy Eskut initiated her conversation with Pleban by informing him that she was calling on behalf of the sheriff's department. On numerous occasions she referred to herself within the context of the sheriff's department. Pleban repeatedly indicated that he understood that she was affiliated with the sheriff's department and repeatedly assured her that he would not hurt her because he would never shoot a police officer. Pleban frequently indicated that he believed that there were snipers in the area ready to shoot him, and Deputy Eskut responded every time that they had not mobilized snipers and that they merely wanted to help Pleban. Although Pleban repeatedly asserted that he would not harm a police officer, he continuously asserted that he was planning to shoot and kill himself and the family's two dogs. Pleban gleefully described the numerous firearms he had in the house, including two loaded .45 Magnum pistols with hollow point bullets which he had next to him. Pleban bragged that he had "all kinds of ways to kill [him]self" and that he "would be dead before the cops get in here." While Deputy Eskut was able to calm Pleban down at times, he consistently refused to leave his house and talk with her despite her assertions that she would not leave until they had resolved his stand-off.

{¶23} Deputy Eskut testified that, as the night wore on, Pleban became more agitated and began to threaten to kill anyone who came to his door. After he made such threats, hung up, and refused to reengage in communications with Deputy Eskut, the LCSD brought in the SWAT team, set up a perimeter to close roads in the immediate area, and deployed "Snoopy," an armored personnel carrier. Pleban only agreed to leave his home around 8:00 a.m. on February 26, 2009, 12-14 hours after law enforcement arrived on the scene and initiated negotiations, and only because he believed that the armored vehicle on his property was going to "blow [his] house down."

{¶24} Sergeant Ashdown testified that multiple units and SWAT team members were sent to the area to prevent traffic from entering the area, to notify residents within the perimeter to remain indoors, to evacuate other residents in close proximity to Pleban's home, and to escort other residents out of their homes safely if they had to leave.

{¶25} Thomas Kelley, the emergency management homeland security director for Lorain County, testified that at approximately 4:00 a.m. on February 26, 2009, as the armed stand-off situation continued, he notified the Elyria school system regarding the road closures necessitated by safety concerns and directed the schools to reroute buses for the three affected schools in the situation area.

{¶26} Richard Nielson, director of business services for the Elyria city school district, testified that he received phone calls on February 26, 2009, from the transportation facility and the LCSD requesting the rerouting of all schools buses in the Murray Ridge area because of a hostage situation. He testified that 120-180 students were disrupted. Mr. Nielson testified that the necessary rerouting caused inconvenience because children arrived late to school, educational

programs were disrupted, and bus drivers had to work longer hours to accommodate the need for alternate routes, which caused additional costs for the school district.

{¶27} Deputy Eskut testified that Mrs. Pleban remained on scene all night and that she had on-going contact with Mrs. Pleban during the course of her negotiations with Pleban, informing Mrs. Pleban regarding the situation with her husband. The deputy testified that Mrs. Pleban remained worried and upset during her husband's stand-off with law enforcement. Deputy Eskut testified that Mrs. Pleban never criticized the actions of the law enforcement/SWAT personnel, never requested that she be allowed to enter her home or speak with her husband, and never recanted her earlier statements about her husband's instability.

{¶28} Reviewing the evidence in a light most favorable to the State, this Court concludes that any rational trier of fact could have found the essential elements of the charge of inducing panic were proved beyond a reasonable doubt. See *Jenks* at paragraph two of the syllabus. The State presented evidence that Pleban attempted to cause his wife to believe that he would kill himself and the couple's two dogs. The evidence demonstrated that Mrs. Pleban was aware of the existence of numerous firearms and ammunition in the couple's home. She had also conveyed to family, friends, and law enforcement her observations regarding her husband's on-going erratic behavior and instability. The State presented evidence that Mrs. Pleban informed her husband that she planned to notify the LCSD because of his threats of harm. The evidence demonstrated that Pleban knew that law enforcement was involved in the situation and that they would not leave until the situation had been resolved, specifically, that he would cease his armed stand-off and exit his home. The State presented evidence that, early in the negotiations with Deputy Eskut, Pleban believed that there was greater involvement by law enforcement than there was at that time. Specifically, Pleban stated that he believed that snipers had been deployed to

shoot him. He mentioned to Deputy Eskut that he was not watching television because he knew that the light from the screen would alert the snipers to his location in the house. It is reasonable to infer that, if Pleban believed that armed snipers had been deployed to shoot him, law enforcement would have also taken appropriate measures to ensure the safety of others in the area, including setting up road blocks, requiring neighbors to either evacuate their homes or not leave their homes, and rerouting traffic away from the area. Members of the public were in fact inconvenienced. The evidence demonstrated that some neighbors were forced to evacuate their homes but were not offered alternate accommodations. Some neighbors were not permitted to leave their homes. Children from three local schools arrived late to school or not at all because of the rerouting of school buses, necessitated by Pleban's threats to use firearms and cause serious physical harm to himself, the family's dogs, and others. Under these circumstances, there was sufficient evidence to establish that Pleban acted with reckless disregard of the likelihood that he would cause serious public inconvenience or alarm when he told his wife that he intended to kill himself and their dogs if she did not return to him. Accordingly, there was sufficient evidence to establish that Pleban committed the offense of inducing panic.

{¶29} Pleban also argues that the State failed to present sufficient evidence of inducing panic because suicide is not a crime and, therefore, does not constitute an offense of violence, which is necessary to establish inducing panic. The State, however, did not charge Pleban with inducing panic in violation of R.C. 2917.31(A)(2), which requires that serious public inconvenience or alarm be premised on the threat to commit any offense of violence. Rather, Pleban was charged in violation of R.C. 2917.31(A)(3), which requires that the serious public inconvenience or alarm be premised on the commission of *any* offense, with reckless disregard

of the likelihood that its commission will cause serious public inconvenience or alarm. Accordingly, Pleban's argument in this regard is irrelevant.

Economic Harm

{¶30} Pleban argues that the State presented insufficient evidence of the amount of economic harm caused by his commission of the offense.

{¶31} Pleban argues that the amount of economic harm constitutes an element of the offense of inducing panic. This Court disagrees.

{¶32} The value of the economic harm caused by Pleban's commission of the crime of inducing panic merely constitutes a special finding that serves to enhance the penalty of the offense. See *State v. Smith*, 121 Ohio St.3d 409, 2009-Ohio-787, at ¶13 (holding that "the value of stolen property is not an essential element of the offense of theft but, rather, is a finding that enhances the penalty of the offense. As such, it is submitted to a fact-finder for a special finding in order to determine the degree of the offense.") R.C. 2917.31(C)(2) provides that, except as otherwise provided in subsequent subsections, inducing panic is a misdemeanor of the first degree. R.C. 2917.31(C)(4)(b) provides that, where a violation results in economic harm in an amount of five thousand dollars or more but less than one hundred thousand dollars, inducing panic is a felony of the fourth degree. Pleban was charged with a felony of the fourth degree, and the indictment further put him on notice of the alleged economic harm, in compliance with due process requirements. See *Smith* at ¶14.

{¶33} R.C. 2917.31(E)(1)(b) defines "economic harm" in relevant part as follows: "All costs incurred by the state or any political subdivision as a result of, or in making any response to, the criminal conduct that constituted the violation of this section *** , including, but not

limited to, all costs so incurred by any law enforcement officers, firefighters, rescue personnel, or emergency medical services personnel of the state or the political subdivision."

{¶34} Sergeant Ashdown testified that he compiled a "rough estimate" of the costs associated with this incident by obtaining cost-related information from the supervisors of the various agencies and services involved. He testified that Captain Cavanaugh, the SWAT commander regarding the incident, provided him with personnel costs for the numerous SWAT team members deployed to the scene. He testified that Tom Kelley provided costs for deployment and operation of the on-site command post. Sergeant Ashdown testified that Assistant Chief Scarboro of the Elyria Township Fire Department provided the costs for the emergency/medical squads and crew on scene. Finally, the sergeant testified that he personally calculated the costs associated with LCSD personnel on scene, including himself; his predecessor on the scene, Sergeant Gallaher; and all perimeter units comprised of ground patrol forces. He emphasized that, while these units were on the scene of the stand-off at Pleban's residence, they were not available to respond to any other calls. Sergeant Ashdown testified that the cost incurred by the government to respond to the situation created by Pleban was $10,340.50.

{¶35} Pleban complains that Sergeant Ashdown included his own pay in the calculation of costs even though he was already on duty the night of February 25, 2009. The statute, however, defines "economic harm" broadly, including "all costs" incurred by any law enforcement officer and other emergency-type personnel. R.C. 2917.31(E)(1)(b). It does not limit those costs merely to overtime pay and/or deployment of additional personnel or equipment. Pleban failed to cite any authority for his argument, and this Court is loathe to

disregard the costs of payment for on-duty personnel deployed in response to public inconvenience or alarm in light of the breadth of the statutory language.

{¶36} Pleban also argues that Sergeant Ashdown's testimony was speculative. Sergeant Ashdown testified that he served as the liaison on scene between the SWAT commander and the communications unit. Accordingly, he was aware of the nature and extent of personnel and equipment deployed to the area. Moreover, the sergeant testified that he collected information regarding costs associated with the response by law enforcement and other service agencies from the supervisors of the involved units and crews. Given Sergeant Ashdown's role in regard to the incident, Pleban's argument that his calculation of the economic harm realized was merely speculative must fail.

{¶37} Reviewing the evidence in a light most favorable to the State, this Court concludes that any rational trier of fact could have found that the State presented sufficient evidence of the economic harm incurred as a result of Pleban's actions. Pleban's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

"PLEBAN WAS DENIED A FAIR TRIAL THROUGH PROSECUTORIAL MISCONDUCT, MERITING REVERSAL OF HIS CONVICTIONS."

{¶38} Pleban argues that his convictions must be overturned on the basis of prosecutorial misconduct. This Court disagrees.

{¶39} When considering whether certain remarks constitute prosecutorial misconduct, a reviewing court must determine "(1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights." *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, at ¶142, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14. The Ohio Supreme Court continued that

"[t]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' This court will not deem a trial unfair if, in the context of the entire trial, it appears beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." (Internal citations omitted.) *Jackson* at ¶142.

The prosecutor's conduct must be considered in the context of the entire trial. See *Darden v. Wainwright* (1986), 477 U.S. 168, 181-182.

{¶40} Pleban's first argues that the assistant prosecutor improperly questioned Mrs. Pleban during cross-examination by eliciting irrelevant testimony and attempting to impeach her in contravention of Evid.R. 608. In so doing, he effectively challenges the trial court's admission of certain evidence rather than the fairness of the trial from the perspective of prosecutorial misconduct.

{¶41} An appellant's captioned assignment of error "provides this Court with a roadmap on appeal and directs this Court's analysis." *State v. Marzolf*, 9th Dist. No. 24459, 2009-Ohio-3001, at ¶16. App.R. 16(A)(7) and Loc.R. 7(B)(7) provide that the argument shall contain the appellant's contentions with respect to each assignment of error. Loc.R. 7(B)(4) requires an appellant to include in his brief a statement of the issues which "shall be a succinct, clear, and accurate statement of the arguments made in the body of the brief." The issue of the trial court's admission of certain evidence is beyond the scope of this captioned assignment of error. Accordingly, this Court declines to address this argument. See *Ulrich v. Mercedes-Benz USA, L.L.C.*, 187 Ohio App3d 154, 2010-Ohio-348, at ¶24, citing *State v. Ashby*, 9th Dist. No. 06CA0077-M, 2007-Ohio-3118, at ¶6 (refusing to address underdeveloped arguments that were not separately assigned as error).

{¶42} Pleban also asserts that the assistant prosecutor's questioning of Mrs. Pleban regarding any plans by her to file a civil lawsuit against the county unfairly prejudiced her

husband's criminal trial. Pleban fails to develop his argument other than to say that the assistant prosecutor's questioning was "clearly calculated to unfairly prejudice [] Pleban's case, and would have been grounds for a mistrial, had this case been tried to a jury." Pleban's mere conclusory statement does not substantiate a conclusion by this Court that the line of questioning merits reversal of his conviction.

{¶43} Assuming arguendo, however, that the assistant prosecutor's questions on cross-examination were improper, the remarks did not prejudicially affect Pleban's substantial rights. Within the context of the entire trial, this Court concludes that Pleban's trial was not unfair because it appears beyond a reasonable doubt that the trier of fact would have convicted Pleban even in the absence of the State's improper questioning of Mrs. Pleban. The evidence presented by the State demonstrates Pleban's guilt beyond a reasonable doubt. Accordingly, Pleban's argument that the assistant prosecutor's questioning of Mrs. Pleban necessitates reversal of his conviction must fail.

{¶44} Finally, Pleban argues that the assistant prosecutor's half-page comment in his post-trial brief in lieu of closing argument regarding his belief that Mrs. Pleban's testimony was incredible further prejudiced his right to a fair trial. Pleban argues that the State again improperly speculated as to an improper motive by Mrs. Pleban premised on her desire to file a civil lawsuit against the county.

{¶45} Generally, a prosecutor is allowed wide latitude in the closing argument to present his most convincing positions to the trier of fact, and "[t]he [trier of fact] should be given credit for sufficient common sense and sound judgment" to weigh the prosecutor's words appropriately. *State v. Woodards* (1966), 6 Ohio St.2d 14, 26; see, also, *State v. Smith*, 9th Dist. Nos. 01CA0039, 01CA0055, 2002-Ohio-4402, at ¶96. "It is well settled that statements made by

counsel in opening statements and closing arguments are not evidence." *State v. Frazier* (1995), 73 Ohio St.3d 323, 338. There is a presumption in a bench trial that the trial judge knows and follows the law, and only considers matter properly before it. *State v. Olah* (2001), 146 Ohio App.3d 586, 593. Pleban has not pointed to anything in the record that would overcome that presumption in this case. His reference to the trial court's direction to defense counsel to rehabilitate the witness relates to Mrs. Pleban's prior testimony regarding statements she made to law enforcement regarding her husband's behavior and threats, not the allegedly forthcoming civil lawsuit. Taken out of context, the trial court's direction to defense counsel does not support Pleban's argument that the assistant prosecutor engaged in misconduct in its questioning of Mrs. Pleban about a civil lawsuit and that such misconduct infringed on Pleban's right to a fair trial. Pleban's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

"PLEBAN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, MERITING REVERSAL OF HIS CONVICTIONS."

{¶46} Pleban argues that he was denied his right to the effective assistance of counsel. This Court disagrees.

{¶47} This Court uses a two-step process as set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 687, to determine whether a defendant's right to the effective assistance of counsel has been violated.

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

**{¶48}** To demonstrate prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

**{¶49}** This Court must analyze the "reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. The defendant must first identify the acts or omissions of his attorney that he claims were not the result of reasonable professional judgment. This Court must then decide whether counsel's conduct fell outside the range of professional competence. Id.

**{¶50}** Pleban bears the burden of proving that counsel's assistance was ineffective. *State v. Hoehn*, 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, at ¶44, citing *State v. Colon*, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶49; *State v. Smith* (1985), 17 Ohio St.3d 98, 100. In this regard, there is a "strong presumption [] that licensed attorneys are competent and that the challenged action is the product of a sound strategy." *State v. Watson* (July 30, 1997), 9th Dist. No. 18215. In addition, "debatable trial tactics do not give rise to a claim for ineffective assistance of counsel." *Hoehn* at ¶45, quoting *In re Simon* (June 13, 2001), 9th Dist. No. 00CA0072, citing *State v. Clayton* (1980), 62 Ohio St.2d 45, 49. Even if this Court questions trial counsel's strategic decisions, we must defer to his judgment. *Clayton*, 62 Ohio St.2d at 49. The Ohio Supreme Court has stated:

> "'We deem it misleading to decide an issue of competency by using, as a measuring rod, only those criteria defined as the best of available practices in the defense field.' *** Counsel chose a strategy that proved ineffective, but the fact that there was another and better strategy available does not amount to a breach of

an essential duty to his client." Id., quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396.

{¶51} "[A] defendant is not deprived of effective assistance of counsel when counsel chooses, for strategical reasons, not to pursue every possible trial tactic." *State v. Brown* (1988), 38 Ohio St.3d 305, 319, citing *State v. Johnson* (1986), 24 Ohio St.3d 87. In addition, "the end result of tactical trial decisions need not be positive in order for counsel to be considered 'effective.'" *State v. Awkal* (1996), 76 Ohio St.3d 324, 337.

{¶52} The Ohio Supreme Court has recognized that a court need not analyze both prongs of the *Strickland* test, where the issue may be disposed upon consideration of one of the factors. *Bradley*, 42 Ohio St.3d at 143. Specifically,

> "'Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing in one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.'" *Bradley*, 42 Ohio St.3d at 143, quoting *Strickland*, 466 U.S. at 697.

{¶53} Pleban argues that trial counsel was ineffective for failing to object to the admission of certain irrelevant or otherwise inadmissible evidence, to wit: (1) recordings of Mrs. Pleban's 911 call; (2) recordings of Deputy Eskut's negotiations with Pleban; and (3) photographs and testimony regarding the Plebans' firearms. We reiterate that there is a presumption that a trial judge knows the law and considers only relevant, material, and competent evidence during his deliberation. *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, at ¶57.

{¶54} Moreover, Mrs. Pleban's 911 call was relevant and not hearsay because it served to show the effect of Pleban's threats to harm himself and the couple's dogs on the alleged victim of the charge of aggravated menacing. It also served to show the effect on law enforcement personnel, i.e., it provided the rationale for the deployment of a hostage negotiator, emergency medical services, and law enforcement personnel.

{¶55} The recorded conversations between Deputy Eskut and Pleban were both relevant and otherwise admissible pursuant to Evid.R. 801(D)(2) as Pleban's own statements offered against him to substantiate the allegations that he knowingly caused his wife to believe that he would cause serious physical harm to himself and the couple's dogs.

{¶56} Finally, evidence relating to the existence of the numerous firearms found in Pleban's home after his arrest was relevant to demonstrate that Pleban knew that his threats of serious physical harm might be taken seriously by his wife, the intended victim of the charge of aggravated menacing. In addition, such evidence was relevant to demonstrate the reasonableness of the response by law enforcement in establishing road blocks, evacuating neighbors, and rerouting school buses, all responses which caused serious public inconvenience or alarm. In addition, the trial court is presumed to have disregarded any evidence deemed merely cumulative.

{¶57} Pleban has not demonstrated that defense counsel's failure to object to the admission of the challenged evidence fell outside the range of professional competence. Accordingly, this Court need not consider the issue of prejudice. Pleban's third assignment of error is overruled.

III.

**{¶58}** Pleban's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
MOORE, J.
CONCUR

APPEARANCES:

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.