[Cite as *State v. Maynard*, 2013-Ohio-2796.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No.      12CA0026 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| GARY E. MAYNARD | COURT OF COMMON PLEAS COUNTY OF WAYNE, OHIO |
| Appellant | CASE No.      11-CR-0224 |

DECISION AND JOURNAL ENTRY

Dated: June 28, 2013

MOORE, Presiding Judge.

{¶1}   Defendant, Gary E. Maynard, appeals from his conviction in the Wayne County Court of Common Pleas.  This Court affirms.

I.

{¶2}   In 2011, the Wayne County Grand Jury indicted Mr. Maynard on one charge of gross sexual imposition in violation of R.C. 2907.05(A)(4), a third degree felony, and one charge of sexual imposition in violation of R.C. 2907.06(A)(4), a third degree misdemeanor.  These charges stemmed from allegations made against Mr. Maynard by his twelve-year-old neighbor, "RH," and her thirteen-year-old friend, "AL."  Mr. Maynard pleaded not guilty and waived his right to jury trial.  The case proceeded to bench trial.  The trial court found Mr. Maynard not guilty of gross sexual imposition and sexual imposition, but it found him guilty of attempted gross sexual imposition and attempted sexual imposition.  In an entry issued on April 10, 2012, the trial court imposed sentence on Mr. Maynard.

{¶3} Mr. Maynard timely filed a notice of appeal, and he now presents three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

MR MAYNARD'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶4} In his first assignment of error, Mr. Maynard argues that his convictions were against the manifest weight of the evidence. We disagree.

{¶5} When a defendant asserts that his conviction is against the manifest weight of the evidence:

> [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶6} In making this determination, this Court is mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), citing *Ostendorf-Morris Co. v. Slyman*, 6 Ohio App.3d 46, 47 (8th Dist.1982) and *Crull v. Maple Park Body Shop*, 36 Ohio App.3d 153, 154 (12th Dist.1987).

{¶7} Here, Mr. Maynard was convicted of attempted gross sexual imposition, in violation of R.C. 2907.05(A)(4) and R.C. 2923.02(A), and attempted sexual imposition, in violation of R.C. 2907.06(A)(4) and R.C. 2923.02(A). R.C. 2907.05(A)(4) provides:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

R.C. 2907.06(A)(4) provides:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other persons, is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of such person, and the offender is at least eighteen years of age and four or more years older than such other person.

{¶8} R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." Accordingly, the culpable mental state for gross sexual imposition and sexual imposition is purposely. *State v. Dunlap*, 129 Ohio St.3d 461, 2011-Ohio-4111, ¶ 28 ("[T]he element of sexual contact in an R.C. 2907.05(A)(4) violation requires a mens rea of purpose."). R.C. 2901.22(A) provides that an action is performed "purposely" when the actor has a "specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶9} R.C. 2923.02(A) prohibits the attempt of an offense, and provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense shall engage in conduct that, if successful, would constitute or result in the offense."

{¶10} Here, in support of its case, the prosecution called RH, AL, their parents, and two police officers. RH testified that she and her family had lived across the street from Mr. Maynard and his wife for about three years, and during that time, Mr. Maynard would occasionally babysit her. She would also spend the night at his house, where she would

sometimes bring her 13-year-old friend, AL. Around March or April of 2011, when RH was 12 years old, Mr. Maynard had begun acting in ways that made her uncomfortable. RH testified that Mr. Maynard had begun pushing her up by her buttocks while he followed her as she ascended his stairs. In Mr. Maynard's guest bedroom, RH and AL would often dress up and make videos utilizing a computer with a webcam. On one occasion, after Mr. Maynard brought the girls food into the guestroom, he hugged AL from behind her, with his arms and hands around AL's breasts. On another occasion, Mr. Maynard tried to lift RH's shirt, tank top and bra while he was making strange faces and sounds. Mr. Maynard also took RH and AL to his mother's house to use her hot tub. The three of them got in the hot tub in their swimsuits, and Mr. Maynard grabbed them by their waists to pull them toward his lap. On another occasion, RH and AL were using Mr. Maynard's telephone to play games. RH saw a picture list and discovered pictures of her and AL wearing tank tops, and she was uncomfortable seeing these pictures because she did not recall Mr. Maynard taking them. RH recalled another incident when Mr. Maynard was rubbing her shoulders, and his hands moved quickly down her shirt and bra, which startled her and made her jump. RH said that Mr. Maynard would frequently rub her shoulders and recalled that "he kept like trying to get down my shirt." RH told Mr. Maynard to stop or she would tell her father, and Mr. Maynard would respond that if she did, he would take back everything that he had bought for her.

{¶11} RH further testified that Mr. Maynard bought her clothes and a cell phone. She left the phone at AL's house because RH had her own phone, and AL's phone had been shut off. One night when she was at AL's house, RH and AL told AL's mother, Patricia L., about some of the incidents above that had concerned RH.

{¶12} AL testified that she was thirteen years old in March and April of 2011. She had met Mr. Maynard when he and she were both present at RH's home. Thereafter, AL would occasionally accompany RH when she visited Mr. Maynard's house. AL and RH would make videos on the computer in Mr. Maynard's guestroom. She thought that Mr. Maynard was nice, but he had begun to act in ways that made her uncomfortable. Mr. Maynard would come into the guestroom and hug the girls from behind them, and would move his hands from the tops of their chests down to their waists, and, in doing so, his hands would touch their breasts. Also, sometimes Mr. Maynard would touch the girls' buttocks while hugging them. He would also touch their buttocks when they ascended his steps. Once, when the girls were preparing to change, Mr. Maynard did not want to leave the guestroom, although he did ultimately exit the room prior to them undressing. On another occasion, AL went with RH to Mr. Maynard's mother's home to use the hot tub. While they were in the hot tub, Mr. Maynard repeatedly pulled RH toward him.

{¶13} AL further testified that RH had left several items of clothing and a cell phone at AL's home. RH told her that Mr. Maynard had purchased the clothes and cell phone for her, but she was not supposed to let her parents know. RH told AL that she could use the cell phone. However, AL's mother, Patricia L., found the cell phone and questioned the girls about it.

{¶14} Patricia L. testified that RH had brought several items of clothing to her home and wanted to keep this clothing secret from her parents. Thereafter, Patricia was home from work while AL was at school, and she heard a noise coming from AL's room. When she inspected, she found a cell phone that had a picture of Mr. Maynard and a text requesting RH to call him. Patricia answered the text by asking who it was that was texting. Mr. Maynard responded by asking "Is this [AL?]" She then wrote back saying that she was AL's mother, but she did not

receive any further texts. She called the number and received an automated voicemail message. That night, she asked AL and RH about the cell phone. RH told Patricia that Mr. Maynard had purchased the phone for her, but her father was not supposed to know. RH also told Patricia that Mr. Maynard had begun making comments to her that made her feel uncomfortable. Patricia told RH that she needed to tell her parents. However, the next day, Patricia L. spoke with RH's mother, Patricia H., and asked her where RH was. Patricia H. told her that RH was at Mr. Maynard's house. Patricia L. then told Patricia H. about the conversation she had with RH.

{¶15} Patricia H. testified that Mr. Maynard would frequently assist her and her husband, Todd, in watching RH. Patricia H. first became aware that Mr. Maynard was acting inappropriately toward RH on April 26, 2011, when Patricia L. notified her that something had happened with a telephone and that Mr. Maynard was "trying to do stuff to them." When Patricia H. asked RH what had occurred, RH told her that Mr. Maynard had been trying to touch her, and that he had put his hands down her shirt and had touched her buttocks. Patricia H. then telephoned her husband, who was working in Pennsylvania.

{¶16} Todd testified that he thought of the Maynards like family. However, he was concerned about the relationship between RH and Mr. Maynard, and, in April of 2011, he and his wife asked RH if there was anything "going on" between RH and Mr. Maynard. RH denied that there was. On April 26, 2011, his wife called him while he was working in Pennsylvania, and she informed him that "what we thought might happen happened." Todd then drove home, and he arrived at his house early the next afternoon. He waited on his stoop for Mr. Maynard to arrive home from work. When Mr. Maynard arrived home, he approached Todd. As Mr. Maynard was walking toward him, Todd told him to stop, and, when Mr. Maynard asked why, Todd informed him that he knew why. Todd then asked Mr. Maynard what gave him the right

"to put [his] hands on" RH, and Mr. Maynard responded "because she let me," at which point Todd struck Mr. Maynard.

{¶17} A neighbor testified that she had witnessed Todd and Mr. Maynard arguing by the street. She overheard Todd ask Mr. Maynard, "[W]hat gave you the right to do that to my daughter," and she heard Mr. Maynard respond that "she told me I could." Todd then punched Mr. Maynard, and she telephoned police.

{¶18} Officer Brandon Lash of the Wooster Police Department responded to the call. Officer Lash testified that someone had reported an altercation, but when he arrived at the scene, Todd and Mr. Maynard were standing on the street and things appeared to have calmed. When the officer approached, Todd began referencing inappropriate sexual behavior of Mr. Maynard toward Todd's daughter. The officer then interviewed Todd, Patricia H., and RH, and Officer Clint Bartolic, who had also arrived at the scene, interviewed Mr. Maynard. On cross-examination, Officer Lash testified that, when he interviewed RH, she indicated that Mr. Maynard's attempts to touch her breasts were unsuccessful. Officer Bartolic testified that, when he interviewed Mr. Maynard, Mr. Maynard denied that he at any time inappropriately touched RH.

{¶19} Detective Anthony Lemmon testified that he arrived at the scene after Officers Lash and Bartolic. When the detective arrived, he advised the officers to arrange interviews with the girls through the Child Advocacy Center. On May 5, 2011, Detective Lemmon watched on closed circuit television as RH was interviewed by Child Advocacy personnel. On cross-examination, the detective authenticated a video copy of the interview. During the interview, RH stated that, approximately two months prior, Mr. Maynard had tried to stay in the room with her and AL while they changed clothes. After that, he was giving AL a hug, and RH saw him

grab AL's buttocks. Two weeks prior, she and AL spent the night at Mr. Maynard's home, and RH saw pictures of RH and AL on Mr. Maynard's cell phone. The picture of AL appeared to have been shot from an angle veering down her tank top. A few days after RH discovered the pictures, Mr. Maynard tried to take off RH's top, and his hands went underneath her top, tank top and bra. RH stated that Mr. Maynard had tried to put his hands down both of the girls' shirts, and that he would touch their buttocks as they walked up the steps, and, when doing so, would make odd sounds. The Child Advocacy representative provided an anatomical drawing to RH and asked her to indicate on the picture where Mr. Maynard had touched her. On re-direct examination, the detective identified the drawing as the State's Exhibit B. The exhibit indicates that RH circled the breasts and buttocks on the drawing.

{¶20} The defense provided the testimony of the Maynards. Neither Mr. nor Mrs. Maynard recalled the girls spending the night at their home in March or April of 2011. Mr. Maynard testified that he was like an uncle to RH. He maintained that he never touched RH's or AL's breasts. He acknowledged that he did at times "smack" them on their buttocks with the back of his hand when they would "lollygag," but there was nothing sexual associated with this. Mr. Maynard explained that he purchased a cell phone for RH because her father would often restrict RH's use of her own phone, and Mr. Maynard would then be unable to reach her to see if she needed a ride home from school. In mid-April, Mr. Maynard learned that RH had given the phone to AL to use, and he demanded return of the phone. RH was very upset regarding his demand to return the phone.

{¶21} Mr. Maynard further testified that he was making Native American regalia for RH, and he had measured her for the outfit. When Todd confronted him in the street in April,

Todd asked him why he had "measure[d]" his daughter. He responded that RH had let him, believing that Todd was referencing the measurements Mr. Maynard had taken for the regalia.

{¶22} The State called Todd on rebuttal. Todd maintained that he never inquired of Mr. Maynard why he "measure[d]" RH, and Mr. Maynard had never said anything to him about measuring her.

{¶23} The crux of Mr. Maynard's manifest weight argument is that the victims were not credible because their accounts of his actions were vague and inconsistent, and because the testimony at trial had not established any wrongdoing on the part of Mr. Maynard until he demanded the return of his cell phone. However, although the record demonstrates that RH and AL recounted somewhat differing versions of the incidents at issue, and their statements to various witnesses changed somewhat over time, the trial court was free to believe all, part, or none of their testimony. *Prince v. Jordan*, 9th Dist. No. 04CA008423, 2004-Ohio-7184, ¶ 35, citing *State v. Jackson*, 86 Ohio App.3d 29, 33 (4th Dist.1993). This is because the trier of fact "is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*, 9th Dist. No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino,* 89 Ohio App.3d 646, 659 (8th Dist.1993). After a review of the record, we cannot conclude that this is the extraordinary case where the trial court created a manifest miscarriage of justice in finding Mr. Maynard guilty of attempted gross sexual imposition and attempted sexual imposition. Accordingly, Mr. Maynard's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

INASMUCH AS THE STATE FAILED TO PUT [MR. MAYNARD] ON NOTICE THAT IT WAS SEEKING A CONVICTION UNDER OHIO'S ATTEMPT STATUTE, THE TRIAL COURT ERRED AND VIOLATED [HIS] DUE PROCESS RIGHTS BY FINDING [HIM] GUILTY THEREUNDER[.]

**{¶24}** In his second assignment of error, Mr. Maynard argues that the trial court violated his due process rights by convicting him of attempted gross sexual imposition and attempted sexual imposition because the State failed to provide him notice that it was seeking convictions for attempted offenses. We disagree.

**{¶25}** R.C. 2945.74 provides in part that "[t]he jury may find the defendant not guilty of the offense charged, but guilty of an attempt to commit it if such attempt is an offense at law." Likewise, Crim.R. 31(C) provides in part that "[t]he defendant may be found not guilty of the offense charged but guilty of an attempt to commit it if such an attempt is an offense at law."

**{¶26}** This Court has recognized:

> Both R.C. 2945.74 and Crim.R. 31(C) provide, in relevant part, that the trier of fact may find a defendant not guilty of a charged offense, but guilty of an attempt to commit the charged offense if such attempt is an offense at law. It is well established that attempts to commit charged crimes constitute one of the three types of lesser offenses a trier of fact may consider when determining a defendant's guilt, the other two types being inferior degrees of the indicted offense and lesser included offenses.

*State v. Pleban*, 9th Dist. No. 10CA009789, 2011-Ohio-3254, ¶ 9, citing *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, ¶ 10, citing *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph one of the syllabus.

**{¶27}** "Lesser included offenses need not be separately charged in an indictment, because when an indictment charges a greater offense, it necessarily and simultaneously charges the defendant with lesser included offenses as well." (Internal quotations omitted.) *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, ¶ 8. Therefore, "although an accused may be convicted of a lesser included offense, it is not necessary that each lesser included offense of a crime be set forth in the indictment." *State v. Robinson*, 9th Dist. No. 94CA005788, 1995 WL 110134, *2 (Mar. 15, 1995), quoting *White v. Maxwell*, 174 Ohio St. 186, 188 (1963).

Consequently, "[a]s it is well understood that indictment on a greater offense simultaneously charges a defendant with lesser offenses, [Mr. Maynard] was given adequate notice that he had been charged with [gross sexual imposition, sexual imposition] and each of [their] lesser offenses." *State v. Cole*, 9th Dist. No. 17064, 1995 WL 752682, *2 (Dec. 20, 1995). We note that Mr. Maynard has not argued that his indictment was insufficient, and he set forth legal precedent that the trier of fact could find him guilty of attempt. Such would constitute a lesser included offense to the indicted offense. Further, he has not provided any authority to support his argument that, under the circumstances of this case, he was denied due process. Accordingly, Mr. Maynard's second assignment of error lacks merit and is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT MISAPPLIED THE ATTEMPT STATUTE TO [MR. MAYNARD]'S CONDUCT THROUGH THE IMPOSITION OF A LESSER DEGREE OF CULPABILITY THAN THAT REQUIRED TO CONVICT UNDER THE INDICTED OFFENSES[.]

{¶28} In his third assignment of error, Mr. Maynard maintains that the trial court applied a less stringent culpable mental state than that of purposely in convicting him of attempted gross sexual imposition and attempted sexual imposition. We disagree.

{¶29} "A person acts purposely when it is his specific intention to cause a certain result," which, here, would be sexual arousal or sexual gratification of either the offender or the victim. R.C. 2901.22(A), *Dunlap*, 2011-Ohio-4111, ¶ 28 ("[T]he element of sexual contact in an R.C. 2907.05(A)(4) violation requires a mens rea of purpose."). The trier of fact can infer "from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01." *State v. Cobb*, 81 Ohio App.3d 179, 185 (9th Dist.1991). This is because "[t]he determination of a defendant's mental state, absent some comment on his or her part, must of necessity be

determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances." (Quotation omitted.) *In re Anderson*, 116 Ohio App.3d 441, 443 (12th Dist.1996).

{¶30} Here, Mr. Maynard maintains that the trial court must have applied a mental state of less stringent culpability than that of purposely in regard to "sexual arousal or gratification" because (1) it made no finding that Mr. Maynard acted with the purpose of sexual arousal or gratification in attempting contact with RH and AL, and (2) there was no actual proscribed contact committed from which the requisite purpose could be inferred with respect to attempted conduct.

{¶31} First, we know of no requirement that the trial court explicitly issue a finding that the attempted contact was for the purpose of sexual arousal or gratification. Appellant has pointed us to no authority standing for that proposition, and our research has uncovered none. Next, although the trial court found that the State had not proved actual sexual contact, the trial court had evidence before it from which it could infer that the attempted contact itself was purposeful and was done for the purpose of sexual arousal or gratification. RH and AL testified that Mr. Maynard had repeatedly tried to touch their breasts on so many occasions and under such circumstances that the trial court could have appropriately determined that there lacked a legitimate explanation for his behavior. He had refused to leave the guest room while the girls changed clothes. In addition, the testimony indicated that Mr. Maynard had been observing and photographing the girls surreptitiously. AL testified that the girls had replayed a video recorded on the webcam that showed Mr. Maynard looking in on them as they played, and RH testified that Mr. Maynard had pictures of the girls in tank tops on his phone which were taken unbeknownst to her. Moreover, RH testified that when she threatened Mr. Maynard that she

would tell her father about his attempted contact with her, he responded that he would take back all the items he had purchased for her. Based upon the circumstances surrounding the attempted contacts, the trial court had ample evidence before it from which it could infer that Mr. Maynard attempted to engage in sexual contact with RH and AL for the purpose of sexual arousal or gratification. Accordingly, Mr. Maynard's third assignment of error is overruled.

III.

{¶32} Mr. Maynard's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

BELFANCE, J.
HENSAL, J.
CONCUR.


APPEARANCES:

MICHAEL C. ASSEFF, Attorney at Law, for Appellant.

ALEK EL-KAMHAWY, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.