[Cite as *State v. Miller*, 2015-Ohio-279.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27048 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| CARLOS E. MILLER | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 13 03 0861 |

DECISION AND JOURNAL ENTRY

Dated: January 28, 2015

CARR, Judge.

{¶1} Defendant-Appellant, Carlos Miller, appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On the evening of December 28, 2012, Alana W. was at the hospital with a friend. After speaking with the father of her children on the phone, Alana agreed that she would get the children from him and take them to her home. Because her car had been damaged, however, Alana needed a ride from the hospital. She accepted a ride from Miller, who was an acquaintance of hers and a friend of her children's father.

{¶3} According to Alana, Miller touched her buttocks as soon as she got into his car and, as they drove, spoke to her about having feelings for her. According to Miller, Alana hugged him when she got into the car and the two only spoke about their mutual interests. The two also gave different accounts of the number of stops they made when they were together in

the car. In any event, both agreed that Miller eventually brought Alana to her friend's house so that she could retrieve the car seats that she had left there earlier in the day.

{¶4} At some point after Miller brought Alana to her friend's house, the two engaged in vaginal intercourse in the passenger's seat of the car. According to Alana, Miller made several advances that she resisted before he climbed over the seat and forced her to engage in intercourse. According to Miller, Alana initiated their encounter after smoking crack cocaine and the two had consensual intercourse. After Alana exited the car, she went directly to her friend's house. There was testimony that Alana banged on the door and, once she was allowed inside, turned off the lights, hid under the dining room table, and told her friend that she had been raped. Her friend and his brother contacted the police shortly thereafter.

{¶5} A grand jury indicted Miller on one count of rape, in violation of R.C. 2907.02(A)(2). A jury trial took place, at the conclusion of which the jury found Miller guilty. The court sentenced Miller to nine years in prison and classified him as a tier III sex offender.

{¶6} Miller now appeals from his conviction and raises five assignments of error for our review. For ease of analysis, we rearrange and combine several of the assignments of error.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED STRUCTURAL ERROR BY REMOVING MILLER'S RETAINED, ATTORNEY-OF-CHOICE IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED STRUCTURAL ERROR BY INDEPENDENTLY INVESTIGATING AND THEREAFTER REVIEWING EVIDENCE THAT WAS OUTSIDE THE RECORD IN DECIDING A SUBSTANTIVE ISSUE.

{¶7} In his first assignment of error, Miller argues that the court committed structural error by not allowing him to proceed to trial with his counsel of choice. In his second assignment of error, Miller argues that the court committed structural error when it relied on evidence outside of the record to refuse him his counsel of choice. We disagree with both propositions.

{¶8} The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to counsel for his defense. *Accord* Ohio Constitution, Article I, Section 10. "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). "[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 625 (1989). A court commits structural error when it wrongfully denies a defendant his counsel of choice, so a defendant need not demonstrate further prejudice. *Gonzalez-Lopez* at 150. "[T]he erroneous deprivation of a defendant's choice of counsel entitles him to an automatic reversal of his conviction." *State v. Chambliss*, 128 Ohio St.3d 507, 2011-Ohio-1785, ¶ 18. Accordingly, the issue before this Court is whether the trial court violated Miller's constitutional right to counsel.

{¶9} Although a criminal defendant has a constitutional right to his choice of counsel, that right is not unqualified. *State v. Keenan*, 81 Ohio St.3d 133, 137 (1998). Instead, the "right to choose one's own counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). "A defendant does not have the right to be represented by (1) an attorney he cannot afford; (2) an attorney who is not willing to represent the defendant; (3) an

attorney with a conflict of interest; or (4) an advocate (other than himself) who is not a member of the bar." *State v. Howard*, 5th Dist. Stark No. 2012CA00061, 2013-Ohio-2884, ¶ 39, citing *Wheat* at 159. Moreover, "the courts have recognized that [the defendant's] right is balanced against the need for efficient and effective administration of criminal justice." (Internal quotations and citations omitted.) *Lorain v. Pavlich*, 9th Dist. Lorain No. 06CA008919, 2006-Ohio-6193, ¶ 8. "[A] trial court[] [possesses] wide latitude in balancing the right to counsel of choice against the needs of fairness * * * and against the demands of its calendar." (Internal citations omitted.) *Gonzalez-Lopez* at 152.

{¶10} After Miller's arrest in March 2013, the Akron Municipal Court appointed Attorney Don Hicks to represent him. The case was later transferred to the Summit County Court of Common Pleas, but Attorney Hicks continued to represent Miller throughout the discovery and pretrial process. Five days before Miller's scheduled trial date, Attorney Charles Quinn filed a notice of appearance as counsel on behalf of Miller. Attorney Quinn also appeared at the final pretrial, which took place on the same day that he filed his notice of appearance.

{¶11} At the final pretrial, Attorney Hicks indicated that he would withdraw as counsel if Miller wished to have Attorney Quinn represent him. The trial judge, however, expressed her concern about substituting defense counsel five days before trial, particularly when Attorney Hicks was well-qualified and she had not been made aware of any breakdown in the attorney-client relationship. The trial judge noted that she was "highly concerned" that the substitution had been posed as "some sort of tactic or strategy" to delay the trial and that, while she would permit Attorney Quinn to appear on behalf of Miller, she still intended to go forward with the scheduled trial. The judge then asked Attorney Quinn about his involvement in the case.

{¶12}  Attorney Quinn indicated that he had "some contact" with Miller even before his arrest, but had not agreed to act as counsel because Miller had not paid him his retainer.  He further indicated that he had just agreed to take the case because a family member of Miller's had stepped forward and had promised to pay his fees.  The trial court then indicated that it would take the matter under advisement and scheduled a hearing for the following day.

{¶13}  The following day, the trial judge informed the parties that she had looked at Miller's municipal court file and had noted that Attorney Quinn's name had been written on the file and crossed off.  Attorney Quinn explained that the clerk's office had recorded his name in error and had removed it once he clarified that he was not, in fact, representing Miller at that time.  Attorney Quinn specified that he did not know anything about the substance of the case and had not reviewed any of the discovery materials.  He stated that his contact was limited to speaking with Miller early on about his arrest warrant.  He further stated that, due to his past dealings with Miller and his family, he would be willing to act as counsel even if it later turned out that he did not receive his entire fee.

{¶14}  Although Miller indicated that it was his desire to have Attorney Quinn represent him, Attorney Quinn informed the court that he would not be prepared to go forward with the trial as scheduled.  He indicated that he had explained that fact to Miller and advised him that, if there was no continuance, he should rely on Attorney Hicks to represent him.  Attorney Quinn stated that Miller "would prefer to have me as his attorney but not under the circumstances of trial being Monday."  Accordingly, Attorney Quinn suggested that Attorney Hicks remain on the case if the court was not willing to grant a continuance.  The trial court accepted that resolution, noting that there had been no evidence presented of a breakdown in the relationship between

Attorney Hicks and Miller and that both the court and the State were prepared to go forward with the scheduled trial.

{¶15} In his second assignment of error, Miller argues that the trial court committed structural error when, in considering whether to allow Attorney Quinn to act as Miller's counsel, it consulted evidence outside the record. The evidence to which Miller refers is his file from the Akron Municipal Court. He argues that the court deprived him of a fair trial when it conducted its own investigation and "became intimate with highly probative evidence" in the municipal court file days before his jury trial.

{¶16} To the extent Miller argues that the trial court reviewed "highly probative evidence" in his municipal court file, that argument is purely speculative. The court indicated that it pulled Miller's municipal court file for the purpose of determining the level of Attorney Quinn's involvement in the matter. The court noted that Attorney Quinn's name had been marked on the file, but crossed off, and asked Attorney Quinn for an explanation. The court did not indicate that it had looked at any other part of the file. Moreover, while the court stated that it had pulled Miller's municipal court file, copies of items from Miller's municipal court file were already on file in this case. Specifically, on April 16, 2013, copies of the following items from Miller's municipal court file were filed in this case: (1) the front cover of his file; (2) the affidavit in support of his arrest; (3) the sworn complaint and warrant for his arrest; and (4) an order for testing for HIV and/or venereal disease. On the front cover of Miller's municipal court file, the name "Chuck Quinn" is crossed out in the space marked "Attorney," and the name "Don Hicks" is written in. Accordingly, the information that the trial court referenced was already a part of its file in this case.

**{¶17}** "It is well established that a trial court may take judicial notice of prior proceedings in the immediate case before it." *State v. Brown*, 9th Dist. Summit No. 24119, 2008-Ohio-5846, ¶ 16. Because the material the court referenced was already a part of its file, Miller has not shown that the court relied upon evidence outside of the record in deciding whether Attorney Quinn should act as defense counsel. Consequently, his second assignment of error is overruled. We next consider his first assignment of error.

**{¶18}** Initially, we note that Miller has not argued that the trial court erred by refusing to grant him a continuance of his trial in order to secure new counsel. Miller's captioned assignment of error is limited to the issue of whether the court violated his constitutional right to counsel, and thus, committed structural error. Accordingly, our review is limited to that issue alone. *See State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 41, quoting *State v. Marzolf*, 9th Dist. Summit No. 24459, 2009-Ohio-3001, ¶ 16 ("An appellant's captioned assignment of error 'provides this Court with a roadmap on appeal and directs this Court's analysis.'"). The issue of whether the trial court erred by not continuing Miller's scheduled trial is beyond the scope of Miller's captioned assignment of error. Thus, we decline to address it. *See id.*; App.R. 16(A)(7).

**{¶19}** Upon review of the record, we do not agree that the trial court committed structural error by not replacing Attorney Hicks with Attorney Quinn. Miller did not seek to have Attorney Quinn step in as his counsel until five days before his scheduled trial date. While Attorney Hicks and the prosecutor indicated that they were prepared for trial, Attorney Quinn informed the court that he would not be prepared to go forward with the trial as scheduled. He freely admitted that he was not familiar with the substance of the case and had not reviewed any discovery. He stated that he had discussed that issue with Miller and that Miller "would prefer to

have me as his attorney *but not under the circumstances of trial being Monday*." (Emphasis added.) He suggested that, if the trial remained as scheduled, Attorney Hicks continue to represent Miller. In not removing Attorney Hicks from the case, the court simply followed Attorney Quinn's suggestion.

{¶20} Miller never gave any indication that he was dissatisfied with Attorney Hicks' representation. On the first day of trial, Miller stated that he was "very comfortable with [Attorney Hicks]" and prepared to go forward with the trial. At the conclusion of the trial, Miller even asked the court to appoint Attorney Hicks as his appellate counsel because he felt that Attorney Hicks "did a great job." The record does not bear out Miller's assertion that the court violated his right to counsel. Instead, the record reflects that the trial court balanced Miller's right to counsel "against the needs of fairness * * * and against the demands of its calendar." (Internal citations omitted.) *Gonzalez-Lopez*, 548 U.S. at 152. While Attorney Quinn may have been Miller's first counsel of choice, it was Attorney Hicks who was prepared to go forward with the scheduled trial. Under these specific facts and circumstances, we cannot conclude that the court violated Miller's right to counsel. Accordingly, Miller's first assignment of error is overruled.

## **ASSIGNMENT OF ERROR III**

> THE PROSECUTOR COMMITTED MISCONDUCT BY BROADCASTING TO THE JURY FROM HIS PERSONAL CELL PHONE A PREJUDICIAL, IRRELEVANT, PREVIOUSLY UNDISCLOSED INTERNET WEBSITE DURING CROSS-EXAMINATION OF THE APPELLANT.

{¶21} In his third assignment of error, Miller argues that his conviction must be overturned on the basis of prosecutorial misconduct. We disagree.

{¶22} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the

defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6, citing *State v. Carter*, 72 Ohio St.3d 545, 557 (1995). The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him. *State v. Lollis*, 9th Dist. Summit No. 24826, 2010-Ohio-4457, ¶ 24. "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Phillips*, 455 U.S. at 219.

**{¶23}** Miller testified on his own behalf. During direct examination, he testified about his career in music and the type of music that he liked to create. He testified that he had worked with a lot of major artists and that his music was available for purchase in the iTunes Store. On cross-examination, the prosecutor asked Miller whether he had a collection of songs on iTunes. When Miller responded affirmatively, the prosecutor asked Miller for the name of his collection. Miller stated that his song collection was entitled "Life's Good." The prosecutor then asked whether the song collection was not, in fact, titled "The Weed." Miller denied that he had a collection of songs entitled "The Weed," and defense counsel objected "to the line of questioning." The prosecutor then moved on to another topic. Later in his cross-examination, however, the prosecutor returned to the topic of Miller's music.

**{¶24}** Because Miller had indicated that he did not have a collection of songs entitled "The Weed," the prosecutor used his cell phone to search iTunes and displayed the results of the search to the jury on the courtroom projector. The prosecutor asked Miller to read the title of the first album listed on iTunes, which was "The Weed." The prosecutor then asked several more

questions about the album, and Miller eventually stated that the album must have been produced by some other artist with the same name. Defense counsel then stated:

> Judge, I would like to indicate an objection to this line of questioning. There is no substantiation to it. He has responded. It is just completely inappropriate.

The judge overruled the objection, and the prosecutor ended his cross-examination and rested his case.

{¶25} The following day, defense counsel renewed his objection outside the presence of the jury. Defense counsel argued that the prosecutor's introduction of "extraneous evidence" from "outside of this court" without first disclosing the evidence to him and memorializing it for purposes of the record violated the Rules of Evidence. The trial court noted that the evidence had been introduced strictly for impeachment purposes and had not been submitted to the jury. Consequently, the court once again overruled the objection.

{¶26} Miller first argues that the prosecutor improperly questioned him during cross-examination by attempting to impeach him with extrinsic evidence in contravention of Evid.R. 608. "In so doing, he effectively challenges the trial court's admission of certain evidence rather than the fairness of the trial from the perspective of prosecutorial misconduct." *Pleban*, 2011-Ohio-3254, at ¶ 40. Because Miller's captioned assignment of error only alleges prosecutorial misconduct, "[t]he issue of the trial court's admission of certain evidence is beyond the scope of this captioned assignment of error." *Id.* at ¶ 41. This Court, therefore, will not address the question of whether the trial court erred by allowing the prosecutor to introduce evidence he obtained from his cell phone during the trial. Instead, we limit our review to the specific issue raised in Miller's captioned assignment of error. *See id.*

{¶27} Miller argues that the prosecutor's conduct on cross-examination deprived him of a fair trial because it improperly brought his character into question. He further argues that he

was prejudiced because the prosecutor deprived him of the opportunity to examine the evidence with which he was questioned in advance of trial.

{¶28} Given the nature of the objections that defense counsel entered, it is questionable whether Miller has preserved the foregoing issues for appeal. "To preserve an alleged error for appeal, a party must timely object and state the specific grounds for the objection." *State v. Rowland*, 9th Dist. Medina No. 07CA0085-M, 2008-Ohio-3213, ¶ 7. Defense counsel did not immediately object when the prosecutor initially began asking Miller about the title of his music collection. Likewise, defense counsel did not immediately object when the prosecutor published the screen shot from iTunes to the jury. When defense counsel ultimately objected on both occasions, he merely cast the prosecutor's line of questioning as improper or inappropriate. He did not enter a more specific objection until after the State rested its case. Consequently, defense counsel's objections were neither as timely, nor as specific as they should have been. *See id.* Even assuming that Miller's arguments have been preserved, however, he has not shown how the prosecutor's alleged misconduct prejudiced him.

{¶29} To prevail on a prosecutorial misconduct argument, "the appellant must show that there is a reasonable probability that but for the prosecutor's misconduct the result of the proceeding would have been different." *State v. Penix*, 9th Dist. Summit No. 23699, 2008-Ohio-1051, ¶ 25. The true title of Miller's iTunes collection was, at best, a point of minor relevance in these proceedings. As set forth below, Alana testified in detail how Miller forced her to engage in sexual intercourse. The jury heard testimony that, immediately after the incident, Alana ran into her friend's house, turned off all the lights, hid under the table, and stated that Miller had raped her. They also heard Miller testify that, after agreeing to drive Alana to her children and being in the car with her for a significant period of time, he left within 10 to 15 minutes of her

exiting the car because it was getting late. Miller has not demonstrated that, in the absence of the evidence about the name of his song collection, the jury would not have convicted him. *See id.* Under the facts and circumstances of this case, we cannot conclude that Miller was deprived of a fair trial. *See Knight*, 2004-Ohio-1227, at ¶ 6. Accordingly, Miller's third assignment of error is overruled.

## ASSIGNMENT OF ERROR V

> MILLER'S CONVICTION IS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶30} In his fifth assignment of error, Miller argues that his conviction is based on insufficient evidence and is against the manifest weight of the evidence. We address each argument separately.

Sufficiency

{¶31} "Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 113, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The test for sufficiency requires a determination of whether the State has met its burden of production at trial." *State v. Edwards*, 9th Dist. Summit No. 25679, 2012-Ohio-901, ¶ 7.

{¶32} R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person * * *." R.C. 2901.01(A)(1). Whoever commits the foregoing offense is guilty of rape. R.C. 2907.02(B).

{¶33} Miller argues that his rape conviction is based on insufficient evidence because the State failed to set forth any evidence of force or the threat of force. He notes that the nurse who examined Alana after the alleged rape testified that the results of her physical examination were unremarkable. Consequently, he argues that there was no evidence that he used force or the threat of force to engage in sexual intercourse with Alana.

{¶34} Alana W., the victim in this matter, testified that she knew Miller through the father of her two children. She testified that, before the incident giving rise to this appeal, she had known Miller for about four years, but limited her contact with him because she disliked him. Sometime during the early evening hours of December 28, 2012, however, Alana and a few of her friends were involved in a car accident. The accident totaled the car Alana had been driving and injured one of her friends. Alana accompanied her injured friend to the hospital, but soon received word from J.T., her children's father, that she needed to come get the children from him. Alana testified that Miller was with J.T. at the time and volunteered to give her a ride from the hospital.

{¶35} Alana testified that the passenger's seat of Miller's car was already reclined when he picked her up at the hospital. She further testified that, when she went to sit down in the car, Miller placed his hand on her seat "so that he could be touching [her] butt when [she] sat down." She testified that she moved Miller's hand away and the two began to drive. She directed Miller

to a drive-thru where she purchased one Black and Mild to smoke because she was under a lot of stress from the accident. According to Alana, she and Miller spoke the entire time they drove and Miller asked her about the status of her relationship with J.T. She testified that Miller admitted he had been attracted to her for years, but had not wanted to say anything if she and J.T. were still involved with one another.

{¶36} Alana stated that she asked Miller to drive her to her friend's house before taking her to J.T.'s because she needed to pick up her children's car seats. Earlier in the day, Alana had left the car seats on her friend's porch so that there would be more room in her car for her friends. Alana testified that Miller parked his car on the street across from her friend's house and the two spoke some more. She stated that Miller once again declared his feelings for her and asked whether she also found him attractive. When she started to shake her head no, Alana testified that Miller told her: "Say no and I'll punch your gut." She then stopped shaking her head and fell silent. Alana testified that the two spoke a little longer before Miller "started getting grabby, touchy feely again."

{¶37} Alana stated that Miller tried to kiss her several times and kept leaning over to touch her. She testified that she repeatedly told Miller to stop touching her and shoved him away, but that she was laughing at first because she believed he was just teasing her. At some point, however, Miller began climbing over the seat. Alana testified that Miller got on top of her and grabbed a hold of her pants while she put her hands on his chest and tried to shove him away. The two then struggled over her pants, and Miller was eventually able to pull them down. Alana testified that she kept trying to push Miller back towards the dashboard and telling him to stop, but that Miller vaginally penetrated her with his penis. Alana continued to push Miller and told him to stop, but Miller told her that he did not want to stop because it felt too good.

Eventually, however, Miller stopped and sat back down in his own seat. Alana testified that she then quickly pulled her pants back up and fled the car. Alana went inside her friend's house and told him she had just been raped. Miller left the scene in his car at some point after Alana entered her friend's house.

{¶38} Yvonne Demyan, a sexual assault nurse examiner in the DOVE Unit of St. Thomas Hospital, testified that she examined Alana within several hours of the incident. Demyan testified that she took a history from Alana and that Alana reported having been raped. Although Demyan noted that the results of Alana's physical examination were unremarkable, she testified that it is common for rape victims not to display any signs of physical trauma. She took multiple swabs from Alana and submitted them for further testing. There was testimony that the swabs Demyan collected from Alana's vagina contained semen and that Miller could not be excluded as the source of the semen.

{¶39} Although the results of Alana's physical examination were unremarkable, "this and other courts have consistently held that the testimony of the victim, if believed, is sufficient to support a conviction, even without further corroboration." *State v. Sparks*, 9th Dist. Summit No. 22111, 2005-Ohio-2154, ¶ 11. Alana testified that Miller threatened to punch her if she said she did not find him attractive and that he climbed on top of her and proceeded to have vaginal intercourse with her while she tried to resist him. She testified that she pushed Miller in the chest and told him to stop, but that he would not. Viewing the evidence in a light most favorable to the State, we must conclude that the State presented evidence from which a rational trier of fact could conclude that Miller used force to compel Alana to submit to sexual conduct. *See* R.C. 2907.02(A)(2). *See also* R.C. 2901.01(A)(1) (force defined). Consequently, his rape conviction is not based on insufficient evidence.

Manifest Weight

**{¶40}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. *Thompkins*, 78 Ohio St.3d at 387. *Accord Otten* at 340.

**{¶41}** Miller argues that his rape conviction is against the manifest weight of the evidence because he and Alana engaged in consensual sexual intercourse, which Alana initiated. He once again argues that the lack of any evidence of physical harm to Alana proves that he did not rape her.

**{¶42}** Miller testified that he was visiting with J.T. and drinking with him when J.T. learned that Alana was at the hospital. Miller testified that he ultimately agreed to pick up Alana from the hospital because she did not have a car and J.T. was angry with her for not being there to take care of their children. According to Miller, Alana hugged him when she got into his car and immediately "said she needed to smoke." Miller testified that Alana then directed him to a house on Grant Street where she purchased crack cocaine while he waited in the car. Once

Alana got back into the car, she asked Miller to take her to a drive-thru to purchase a Black and Mild. Miller also stated that he took Alana to the drive-thru at McDonald's, where the two ordered food and ate it in the parking lot.

{¶43} Miller testified that he subsequently brought Alana to her friend's house so that she could retrieve the car seats for her children. Miller indicated that he had never been to the house before, so he parked where Alana told him to park. He testified that he and Alana remained in the parked car talking about music and other mutual interests. He testified that, at some point, Alana brought out the crack cocaine she had purchased and lined the inside of the Black and Mild with it. According to Miller, he asked Alana to stand outside the car to smoke the Black and Mild because he did not like the smell of crack cocaine. Alana complied and climbed back into the car when she was finished.

{¶44} Miller testified that Alana was "more energetic" when she reentered the car and began touching him and kissing him. Miller testified that Alana then unbuttoned her pants and showed him that she was not wearing underwear. The two began kissing again and, according to Miller, engaged in consensual, vaginal intercourse. Once they were finished, Miller testified that they talked a while longer before Alana got out of the car and walked over to her friend's house. It was Miller's testimony that Alana sat on her friend's porch for several minutes before going inside. Miller testified that he waited 10 or 15 minutes for Alana to emerge and tried to call her cell phone, but ultimately left when she did not return to the car or answer her phone because it was late.

{¶45} DeWayne Peace testified that he was a friend of Alana's and that she had left the car seats for her children at his house earlier that day. Peace testified that it was after midnight when he heard a banging at the door and found Alana on his porch. He testified that Alana

rushed inside, began turning off the lights, hid under the dining room table, and told him that she had just been raped. Peace indicated that Alana looked frightened and scared. Not long after Alana arrived, Peace testified that he and his brother called 911 to report the rape.

{¶46} J.T. testified that he was at home drinking with Miller when he learned that Alana was at the hospital and would not be picking up their children from daycare. J.T. admitted that he was angry with Alana for not picking up the children and that, once he had done so, he told her to leave the hospital and come get the children from his house. J.T. testified that he asked Miller to pick up Alana because she did not have a ride from the hospital. He testified that he knew Alana did not like Miller because she considered him to be arrogant.

{¶47} J.T. stated that he instructed Miller to bring Alana straight back to his house and not to make any other stops. When a significant amount of time had passed and the two still had not returned, J.T. testified that he borrowed his brother's car and began driving around looking for Alana. J.T. stated that he eventually received a phone call in which he learned that Alana had been raped by Miller. He then went looking for Miller. Although he was not able to find Miller, he later spoke with Miller on his cell phone. According to J.T., Miller admitted the he had engaged in sexual intercourse with Alana, but described the encounter as consensual. According to J.T., Miller told him: "when it's something I wanted, I had to take it[.] * * * I couldn't help myself."

{¶48} Miller denied that J.T. told him to come straight back to the house once he had picked up Alana. He also testified that J.T. was lying about his having said he just "had to take it" because he could not help himself. When asked why he left Peace's house without Alana after only 10 or 15 minutes, Miller testified that he left because it was late.

{¶49} Detective John Ross testified that he responded to DeWayne Peace's house after receiving a call about a possible rape and interviewed Peace on the scene. He testified that Peace described how Alana had banged on the door, run into the house, turned off the lights, hid under the dining room table, and told him she had been raped. Detective Ross also testified that he interviewed Alana at the hospital. He described Alana as very quiet during her interview and indicated that she spoke to him with a hospital sheet pulled over her body and her knees brought up to her chest. He then related her description of the events, which was consistent with her testimony at trial. Detective Ross also testified that he later processed Miller's car in the police department's secure holding facility. He stated that he discovered a Black and Mild wrapper in the car along with a bag containing some of Alana's personal belongings. Detective Ross testified that, while he attempted to contact Miller several times before his arrest, his attempts were unsuccessful.

{¶50} Having reviewed the entire record, we cannot conclude that Miller's rape conviction is against the manifest weight of the evidence. Miller and Alana essentially presented the jury with two different versions of the same event. While Miller testified that they had consensual sex, Alana testified in detail about how Miller forced her to have sex with him. "The jury was in the best position to observe their demeanor and ascertain their credibility." *State v. Roper*, 9th Dist. Summit No. 27025, 2014-Ohio-4786, ¶ 28. "This Court will not overturn the [jury]'s verdict on a manifest weight of the evidence challenge only because [it] chose to believe certain witnesses' testimony over the testimony of others." (Alterations sic.) *Id.*, quoting *State v. Shank*, 9th Dist. Medina No. 12CA0104-M, 2013-Ohio-5368, ¶ 29. This Court has carefully reviewed the record and it is our conclusion that this is not the exceptional case where the jury

lost its way in reaching a guilty verdict. *See Thompkins*, 78 Ohio St.3d at 387; *Otten*, 33 Ohio App.3d at 340. As such, Miller's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED BY IMPOSING A "NO CONTACT" ORDER BETWEEN MILLER AND THE PROSECUTING WITNESS.

{¶51} In his fourth assignment of error, Miller argues that the trial court erred when it ordered him not to have any contact with the victim. Specifically, he argues that the trial court lacked authority to issue a no contact order once it imposed his prison term. *See State v. Holly*, 8th Dist. Cuyahoga No. 95454, 2011-Ohio-2284. This Court has already held, however, that "a trial court may impose a no contact order as part of its sentence." *State v. Anderson*, 9th Dist. Summit No. 26640, 2014-Ohio-1206, ¶ 39. This Court has certified our decision in *Anderson* as being in conflict with the Eighth District's decision in *Holly*, and the Supreme Court has accepted the issue for consideration. At present, the Supreme Court has not yet issued a decision. We decline to reconsider our precedent at this time. Because we have already determined that a trial court may impose a no contact order as part of its sentence, Miller's argument lacks merit. *See Anderson* at ¶ 39. His fourth assignment of error is overruled.

### III.

{¶52} Miller's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
CONCURS.

BELFANCE, P. J.
CONCURRING IN JUDGMENT ONLY.

{¶53} I concur in the majority's judgment. With respect to Mr. Miller's fourth assignment of error, I concur out of deference to this Court's precedent. *See State v. Campbell*, 9th Dist. Summit Nos. 27300, 27301, 2014-Ohio-4780, ¶ 22 (Belfance, P.J., concurring). *But see State v. Anderson*, 9th Dist. Summit No. 26640, 2014-Ohio-1206, ¶ 46-58 (Belfance, P.J., concurring in part, and dissenting in part).

APPEARANCES:

SARAH MARGARET HULBURT, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.