[Cite as *State v. Raider*, 2017-Ohio-7788.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | | |

| STATE OF OHIO | | C.A. No. 16CA010926 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| RYAN E. RAIDER | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 13CR088148 |

DECISION AND JOURNAL ENTRY

Dated: September 25, 2017

---

CARR, Judge.

{¶1} Defendant-Appellant Ryan E. Raider appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} In the early morning hours of October 12, 2013, Brandon Smith was shot in the head while lying in his bed next to his girlfriend, E.M. Smith died from his injuries. Smith's housemate, Raider, admitted to shooting Smith, but asserted that it was an accident; Raider maintained that the gun went off when he dropped the weapon.

{¶3} Following an investigation, Raider was indicted on one count of aggravated murder, two counts of murder, and two counts of felonious assault. Each count contained an accompanying firearm specification. The matter proceeded to a jury trial, at which the following testimony was adduced.

{¶4} The State's theory of the case was that Raider intentionally shot and killed Smith so that Raider could develop a relationship with E.M. The State argued that the evidence supported that it was Raider's purpose to shoot Smith and that the shot was fired at close range. The defense argued that there was no ill will between Smith and Raider and that the evidence supported that the shot was accidentally fired when Raider dropped the gun while standing in the doorway, a dozen or so feet away.

{¶5} E.M. lived a couple houses down from Smith's and Raider's house. She spent a fair amount of time with Raider, given that Raider lived with Smith, and thought Smith and Raider seemed to get along and that their relationship seemed pretty normal. E.M. considered Raider to be a friend. He fixed her car once and took her to a doctor's appointment. However, E.M. described Raider as either being in a great mood, or being cranky and tired. One time, about a week before Smith's death, when Raider seemed cranky and tired, E.M. told Raider that she thought he was going to go crazy and kill someone. Raider just laughed.

{¶6} E.M. testified that, while Smith did not have any firearms, Raider did, and he would take them out constantly. She indicated that he also had a BB gun that he had shot people with, including her.

{¶7} The day before the shooting, in between E.M.'s jobs, E.M. and Smith went to a movie to celebrate Smith's recent birthday. After work, they went to Smith's house and were watching TV with Raider and another friend. The four then went to a nearby bar in Avon. While at the bar, Raider talked with E.M.'s son's father. Raider asked on multiple occasions that night whether E.M.'s son's father had ever thought of getting back together with E.M. and Raider seemed relieved when E.M.'s son's father said no. While at the bar, E.M. had five shots and ended up getting into an argument with her son's father's ex-girlfriend, whom she chased out

of the bar with her shoe. Smith was upset by the argument and he and E.M. talked about it outside the bar. The two decided to leave, but Raider would not let them walk home, and insisted on driving them.

{¶8} After dropping them off at Smith's house, Raider went back to the bar. While Raider had been drinking that evening, E.M.'s son's father indicated that Raider seemed fine and did not seem impaired. E.M.'s son's father was not worried about Raider driving and indicated that he did care about people driving drunk as he had been involved in an accident when he was younger caused by a drunk driver.

{¶9} When Raider returned home, Smith and E.M. were in the kitchen talking. E.M. thought Raider appeared to have been drinking. He brought out a handgun and pointed it at Smith's head and asked E.M. if Raider was a robber, would E.M. let him kill Smith. Smith and E.M. thought Raider was joking around, so they played along and E.M. said no and took the gun and pointed it at her own head. At that point, Raider ripped the gun away from her, unloaded it, and the bullets fell to the floor. E.M. had not realized the gun was loaded, yelled at Raider, and went outside.

{¶10} While outside, E.M. called her son's father to apologize for her behavior. E.M. came back inside, and saw Smith and Raider sitting on Smith's bed talking. E.M. went in the bathroom and began crying because she was disappointed in herself and her behavior. Raider came in the bathroom and asked if she was alright. She responded that she felt like a bad mother. Raider told her that she was a great mom and that he loved her. He had never told her anything like that before. She thought he was just drunk.

{¶11} Raider picked E.M. up, carried her into Smith's bedroom, and laid her on the bed next to Smith. Smith was lying in the bed, under the blankets, and towards the edge of the bed

nearest the door. E.M. was placed even closer to the door, almost at the edge of the bed, in a "spoon[ing]" position next to Smith. Raider placed Smith's right arm over E.M. Smith whispered in E.M.'s ear and told her to pretend to be asleep because Raider was being annoying. They both closed their eyes. E.M. heard Raider mumble something and walk out. The next thing E.M. heard was Raider say, "If you lay there just like that." E.M. then heard a really loud sound that caused her to grab her right ear in pain and jumped up. She looked over at Smith and saw blood coming out of his temple. E.M. saw Raider walking out of the room and yelled that he had shot Smith. Raider turned around and told her to call 911. E.M. had been putting pressure on the wound and Raider pushed her away and told her to call 911 and wait outside for the ambulance.

{¶12} Sergeant Kevin Collins with the Avon Police Department was the first to arrive on the scene. He met E.M. in the front yard. She was screaming that someone had been shot and that someone was inside administering first aid. She told Sergeant Collins that she thought the shooting was an accident. Over objection, Sergeant Collins opined that it was not legal to handle a firearm while intoxicated. Sergeant Collins went in the residence and observed Raider administering first aid to Smith when he entered Smith's bedroom. Sergeant Collins had an audio recording device on when he went in the house. Raider can be heard on multiple occasions saying that he dropped the gun and it went off. Raider indicated that he was standing in the doorway near the doorjamb when he dropped the gun. Raider told police that the gun was in the other bedroom, probably under the bed.

{¶13} Captain Timothy Barrett, a firefighter and paramedic with the Avon Fire Department testified that by the time he arrived on the scene, Smith had snoring or agonal respirations which was a very serious condition and was indicative of a head injury. When

Captain Barrett was lifting Smith onto the backboard to transport him to the hospital, Captain Barrett discovered a shell casing underneath Smith's head and pointed it out to the police.

{¶14} Sergeant Robert Olds of the Avon Police Department assisted with evidence collection at the scene of the shooting. Two rounds of ammunition were found on the kitchen floor. A gun was located under Raider's bed with blood staining on it. The slide of the weapon was in the backwards position when it was found. On Raider's bed was a magazine for a rifle and an empty holster. Blood smears were also found on the bed. After the bed was moved, in the corner of the room, a magazine that fit the gun found under the bed was located. Blood smears were found on the wall near where magazine was found in the corner. There were six rounds left in the magazine. Raider's room also contained gun safes and several weapons. The only handgun located was the one found under the bed. Additionally, a pellet gun, assault rifles, and shotguns were found in the room. Sergeant Olds estimated that from the doorway of Smith's room to where the large blood spot was found on Smith's bed was 12 to 15 feet.

{¶15} After E.M. had time to think about the events and after telling the events to various people, she began to think that the shooting was not an accident. On October 14, 2013, E.M. went to the police station to tell the police some details about the evening that she had unintentionally left out and to tell them that her opinion about the events had changed; she no longer believed the shooting was an accident.

{¶16} Around October 14, 2013, Sergeant Bryan Rado with the Avon Police Department started looking at the items of evidence that had been collected. He indicated it was important to examine the evidence and to attempt to analyze whether the events could have taken place the way that Raider said that they did. He reiterated that, initially, the shooting was investigated as possibly being accidental. Sergeant Rado indicated that the "slug" had not been

located and so he searched through the physical evidence and discovered it embedded in one of the pillows that had been on Smith's bed. Subsequently, Sergeant Rado went to the crime scene. In Raider's bedroom, he noticed that some paint had been nicked away from the wall in the corner of the room near the bed, near where prior investigators had located the magazine. Investigators speculated that the magazine had been thrown against the wall. After looking at the photographs and other evidence and talking with other officers, Sergeant Rado became troubled by Raider's version of events. Sergeant Rado testified that based on where the casing was located (on the bed), and because it appeared the slug entered the side of the pillow as opposed to the front, there were concerns with Raider's statement that the gun went off while he was standing in the doorway, as opposed to closer to the bed.

{¶17} Several items from the crime scene were tested for DNA evidence, including the .40 caliber handgun and magazine. A sample from a presumptive blood stain from the t-shirt Raider was wearing contained a DNA profile consistent with that of Smith. The trigger of the handgun also contained a profile consistent with Smith's profile. The swab from the slide of the handgun and the swab from the handle and trigger guard contained a mixture consistent with contributions by both Smith and Raider. The profile obtained from the presumptive bloodstain on the handgun was consistent with Smith's profile. The profile from the stain on the magazine was consistent with Smith's and the profile from the swab of the remainder of the magazine was a mixture consistent with both Smith's and Raider's profiles. No DNA profile was obtained from a swab of the rounds found inside the magazine. Gunshot residue testing indicated that particles highly indicative of gunshot primer residue were identified on samples from E.M., Raider, and Smith. The results signified that those individuals discharged a firearm, were near a firearm when it was discharged, or handled an item with gunshot primer residue on it.

{¶18} Joshua Barr, a forensic scientist assigned to the firearms section of the Ohio Bureau of Criminal Investigation ("BCI") examined the handgun from the case. He found it to be an operable Sig Sauer model P226 .40 caliber semiautomatic pistol. Barr determined that the bullet fragments removed from Smith's head were fired from the gun he examined. He indicated that "[d]uring the firing cycle sometimes [the ejection of the casing] can be unpredictable, but it's designed to go to the right and slightly rearward." However, he acknowledged that it is possible the casing could be ejected forward slightly. When asked if the casing could be ejected 20 feet forward, Barr stated that "would be unlikely, but it's possible."

{¶19} Barr testified that the gun had a single-action and a double-action mode. In single-action mode, it takes approximately 4 pounds of force to fire the gun, while in double-action mode it takes approximately 8 pounds of force to fire the gun. To switch the gun to double-action mode, the decocker lever is pressed. Additionally, Barr averred that an additional safety feature of the gun prevents the hammer from hitting the firing pin without the trigger being pressed. Thus, "if [the] gun were to drop or you would hit the back of it, it couldn't actually contact the firing pin to fire the cartridge." Barr also indicated that the gun has a firing pin block which prevents the firing pin "from going through" absent the trigger being pulled. Barr averred that the gun is a safe gun. He testified that absent the gun malfunctioning or something being broken, the gun would not fire without the trigger being pulled and that he found nothing broken or malfunctioning in the weapon.

{¶20} Dan Galita, M.D., a board certified anatomic and forensic pathologist from the Cuyahoga County Medical Examiner's office, who performed the autopsy on Smith, testified that Smith died from a gunshot wound to the head with skull and brain injuries. The entrance wound was in the left temple and was slightly oval shaped. Medical personal sutured the wound

in an attempt to stop the bleeding. Dr. Galita removed the sutures during the autopsy and was aware that upon removal, 8 puncture wounds, 4 on each side of the wound, remained in the skin. Dr. Galita indicated that wound was surrounded by very dense, or confluent, stippling, as well as isolated stippling marks at the periphery. He testified that the area around the wound was also burned and that there were black gunpowder particles embedded within the wound itself, one inside the wound track, and one in the margin. From those findings, Dr. Galita averred that the shooting was close range, meaning that the gun was less than 6 inches away from the skin when it was discharged. He believed that, more than likely it was probably 1 or 2 inches from Smith's skin when it was fired. He further indicated that one would not expect to see stippling around a wound from a shot fired at distance greater than 3 feet. Dr. Galita testified that he was aware of the phenomenon of pseudostippling, which looks like stippling but is caused by something other than gunpowder, such as the puncture wounds created by sutures. According to Dr. Galita, pseudostippling is "large, * * * irregular in shape, and * * * easy to identify." Dr. Galita stated that he had not confused the puncture wounds for stippling and was aware of where the puncture wounds were because he himself removed the sutures. Dr. Galita pointed out for the jury the areas he believed demonstrated the stippling as compared to the puncture wounds left from the sutures.

{¶21} Dr. Galita also described the exit wound as star shaped and showed it to the jury in the photographs. From the location of the entrance and exit wounds, Dr. Galita asserted that the "trajectory of the bullet was from front to back, left to right, and upwards." The gunshot wound caused extensive damage to the brain and skull and was not a survivable injury. Dr. Galita posited that the shooting caused an instant loss of consciousness.

{¶22} The defense presented three witnesses in an effort to support its theory that the shooting was accidental: Don Renuart, Humphrey Germaniuk, M.D., and Jason Thomason.

{¶23} Renuart was a friend of Raider's. During the day of October 11, 2013, Renuart went to the gun range with Raider for approximately 2 to 2.5 hours to target practice with rifles and handguns. Renuart testified that the two traded guns back and forth, and, at one point, Renuart used Raider's Sig Sauer pistol. He averred that the gun had "a very light trigger pull." To Renuart, that meant that when "you start to pull it, fires." He added that if "you're not used to that, which [he] was not, it almost feels like it goes off unintentionally." He claimed that there were three times during the first clip where he shot the weapon "without even realizing that [he] was going to pull the trigger." Renuart said that he laughed about it and stated that, "This gun scares me." When the gun ejected the casings, he indicated that they ejected to the right side of the gun. He testified that the gun at trial looked like the gun he had used. On cross-examination, Renuart admitted that he had never fired a Sig Sauer before that day and so did not know whether he shot it in single-action or double-action mode, or what the safety features of the weapon were.

{¶24} Dr. Germaniuk, the medical examiner and coroner for Trumbull County, who is also board certified in forensic and anatomic pathology, disagreed with some of Dr. Galita's findings. Specifically, Dr. Germaniuk did not see any stippling around the gunshot wound, soot particles, or burning of the skin based upon his review of the evidence, including the photographs. However, he acknowledged that the person performing the autopsy would be in the best position to view the physical evidence. Dr. Germaniuk thought it was possible Dr. Galita mistook the pseudostippling, caused by the puncture wounds from the sutures, as stippling. Dr.

Germaniuk opined that there was no evidence of a contact or close range gunshot wound. He concluded that it was a distant gunshot wound.

{¶25} Thomason, who is an attorney and CEO and general counsel for the Appalachia Group, and also the chief instructor for the firearms safety academy for Ohio Valley Outdoors, performed testing with a Sig Sauer firearm. However, Thomason did not test the specific weapon used in the shooting. The gun he examined had a single action trigger pull of 4.3 pounds and a double action trigger pull of 9.8 pounds. Thomason fired the weapon from different distances through two sheets of paper taped together to examine the penetration and the pattern that was left on the paper. He performed tests from 2 inches away from the paper to 28 inches away. He concluded that up to 6 inches away there was significant burning of the front area of the page and that the punctures created by the unburned propellant were significant up to a distance of 8 inches. Thomason also asserted that there were still punctures in the paper all the way up to a distance around 24 to 28 inches. However, he could not make a comparison to human skin. He noted that the ejection of the casings was erratic but "[e]ssentially, the shells eject to the right[.]" He also testified that the firearm could fire if it was dropped from any distance; however he did not test that with the weapon and instead got that information from the manual. He opined that the model was "somewhat of an antiquated design" but that it was still "a popular firearm today." He believed that the "Ohio State Highway Patrol carries them[,]" however, "most departments have [gone] to a striker-firing system that doesn't have a hammer, because they are safer than systems that contain a hammer. Because when you have a hammer, you always have the potential of that hammer being struck with some inertia that could cause the system to fire."

{¶26} On cross-examination, Thomason admitted that he does business with Raider's father because Raider's father is a gun wholesaler. Without objection, he was asked whether he was aware that the State of California drops these types of guns out of planes without them discharging. Additionally, Thomason was asked about, and ultimately disagreed with, a statement from a website that indicated that the type of gun at issue "drop[s] safe from a reasonable distance," and that there would have to be "enough force to bend some serious metal before the gun could possibly go off." Following that, Thomason was asked what if he was told that the State dropper a Sig Sauer "some 14 times" and it did not discharge. An objection to that question was sustained but there was no request to strike it or specifically instruct the jury about it.

{¶27} When asked to make the trigger move forward to hit the firing pin without pulling the trigger while in double action mode, Thomason testified that he could not do so. He indicated that there had to be enough force to overcome the safety notch; he did not know how much force would be needed and that it would depend on the individual firearm because each is not exactly identical. When asked if he was suggesting that the murder weapon, if dropped, was going to go off because the hammer would hit the firing pin, he averred that he "never made that statement[,]" but "[a]ny firearm can go off if dropped." Thomason specifically stated that he "wasn't opining about that particular gun [(the murder weapon)]." Instead, he "was talking about that design in general." He agreed that his testimony should not be interpreted to mean that the murder weapon was in any way defective on the day of the shooting. Thomason also acknowledged, without objection, that a person is not supposed to handle a weapon while he has been drinking, as the person would be "under disability."

**{¶28}** During trial, Raider's counsel requested that the trial court instruct the jury that "the Defendant had no obligation to prove anything concerning accident[.]" The trial court declined to give that particular instruction.

**{¶29}** Following deliberations, the jury found Raider not guilty of aggravated murder, but guilty of the remaining counts and accompanying specifications. The trial court sentenced Raider on count two (murder) and merged the remaining counts for purposes of sentencing. Raider was sentenced to 15 years to life for murder and 3 years for the related firearms specification.

**{¶30}** Raider has appealed, raising three assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

DEFENSE COUNSEL'S FAILURE TO OBJECT TO UNFAIRLY PREJUDICIAL EVIDENCE AND FAILURE TO REQUEST A LESSER INCLUDE[D] OFFENSE DEPRIVED THE APPELLANT HIS RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

**{¶31}** Raider argues in his first assignment of error that his trial counsel rendered ineffective assistance for several reasons. Specifically, Raider argues that trial counsel was ineffective in that he failed to request an instruction for the lesser-included offense of reckless homicide, failed to object to the prosecutor bringing forth evidence that Raider committed an uncharged offense, failed to object to other acts evidence, failed to object to evidence that was inadmissible under Evid.R. 402 and/or 403, and failed to request a curative instruction. We do not agree.

**{¶32}** In order to prevail on a claim of ineffective assistance of counsel, Raider must show that his "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998),

citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. Thus, a two-prong test is necessary to examine such claims. First, Raider must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687. Second, Raider must demonstrate that but for counsel's errors, there is a reasonable probability that the results of his trial would have been different. *Keith* at 534.

**Lesser-Included Offense Instruction**

{¶33} With respect to trial counsel's failure to request a lesser-included offense instruction, this Court has stated that "whether to request a specific jury instruction on a lesser-included offense is a matter of trial strategy left to trial counsel's discretion." *State v. DuBois,* 9th Dist. Summit No. 21284, 2003-Ohio-2633, ¶ 5. As the issue to request a jury instruction on the lesser-included offense falls squarely within defense counsel's purview of trial tactics, we will not second-guess counsel's decision. Furthermore, we see nothing in the record to demonstrate that counsel's decision not to request a jury instruction on the lesser-included offense was anything other than a tactical election to seek an acquittal rather than a conviction on the lesser-included offense. *See id.*

**Offense Not Charged**

{¶34} Raider challenges counsel's failure to properly object to Sergeant Collins' testimony that it was illegal to handle a firearm while intoxicated. While counsel did object, he did so on the basis that the testimony was improper redirect, not that the testimony was evidence of an uncharged crime. Even assuming that such testimony was improper evidence of an

uncharged crime, we cannot say that the failure to object was prejudicial. Thomason, an attorney, also acknowledged during cross-examination, without objection, that a person is not supposed to handle a weapon while he has been drinking, as the person would be "under disability." Raider has not challenged on appeal trial counsel's failure to object to that testimony. Accordingly, we cannot conclude there was ineffective assistance with respect to the admission of Sergeant Collins' testimony as there could be no prejudice in light of the other admitted and unchallenged testimony.

**Improper Other Acts**

{¶35} Raider next argues that trial counsel was ineffective for failing to object to E.M.'s testimony that Raider had previously shot her with a BB gun. Raider argues that identity was not an issue and thus the only reason to admit that evidence would be to portray Raider as a bad person or to show that he had a propensity for shooting his friends. The State points out that, "[e]vidence of other crimes, wrongs, or acts * * * may * * * be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). The State contends that the evidence was admissible to demonstrate the absence of mistake or accident, particularly since Raider argued that the shooting was accidental. Raider has failed to address this point in his argument on appeal. Further, this Court has concluded that, "a failure to object may be considered sound trial strategy in that '[a] competent trial attorney might well eschew objecting* * * in order to minimize jury attention to the damaging material.'" *State v. Charlton*, 9th Dist. Lorain No. 12CA010206, 2014-Ohio-1330, ¶ 54, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 90. Given Raider's defense at trial and his limited argument on appeal, we cannot say that Raider has met his burden to demonstrate ineffective assistance of trial counsel in this instance.

**Relevancy and Evid.R. 403**

{¶36} Raider additionally argues that E.M.'s testimony that she told Raider that she thought he was going to go crazy and kill someone should have been excluded under Evid.R. 403 and, her opinion, elicited by the prosecutor, about whether the shooting was an accident, was not relevant.

{¶37} Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Evid.R. 402. Under Evid.R. 403(A), even relevant "evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Moreover, relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

{¶38} With respect to Raider's claim that E.M.'s testimony that she told Raider that he thought he would go crazy and kill someone was inadmissible under Evid.R. 403, we cannot conclude that Raider met his burden to demonstrate ineffective assistance of counsel. The Supreme Court of Ohio has held that "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103; *see also State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, ¶ 117. In light of Raider's blanket assertion that "[i]t is not within the professional norm to fail to object to such unfairly prejudicial testimony[,]" without a discussion of prejudice, we conclude he has not demonstrated ineffective assistance of trial counsel. *See Cepec* at ¶ 116-117.

{¶39} Raider also asserts that E.M.'s testimony elicited by the prosecutor concerning her feelings about whether the shooting was an accident was not relevant. Even if we were to agree, this type of testimony was also elicited from E.M. by defense counsel and was also elicited from

other witnesses. Accordingly, we fail to see how the exclusion of this particular piece of testimony would have changed the outcome of the trial. *See Keith*, 79 Ohio St.3d at 534.

**Curative Instruction and Cumulative Failures**

{¶40} Finally, Raider argues that his trial counsel was ineffective in failing to request a curative instruction following the prosecutor's improper question (discussed below), and that trial counsel's cumulative failures deprived him of the effective assistance of counsel. Raider has failed to develop either of these claims. App.R. 16(A)(7). Raider has not explained how the failure to request a curative instruction fell below the standard required or how the alleged cumulative failures affected the outcome of the trial. *See Keith* at 534.

{¶41} Raider's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE PROSECUTOR'S IMPROPER ATTEMPT TO SUBMIT TO THE JURY A MATTER OUTSIDE THE EVIDENCE THROUGH QUESTIONS ASKED OF A DEFENSE WITNESS DURING CROSS-EXAMINATION DEPRIVED THE APPELLANT A FAIR TRIAL.

{¶42} Raider argues in his second assignment of error that he was deprived of a fair trial based upon the prosecutor's misconduct. Specifically, Raider argues that the prosecutor's question of defense firearms expert Thomason was improper and prejudicial, should have been stricken, and that a curative instruction was required. Under the circumstances of this case, and in light of the argument on appeal, we do not agree.

{¶43} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "This Court has held that [a] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial. The defendant

must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him." (Internal quotations and citations omitted.) *State v. Brooks*, 9th Dist. Lorain No. 16CA010958, 2017-Ohio-5620, ¶ 13. "The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *State v. Miller,* 9th Dist. Summit No. 27048, 2015-Ohio-279, ¶ 22, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140. (Internal quotations and citation omitted.). Thus, "[t]he prosecutor's conduct must be considered in the context of the entire trial." *State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 39.

**{¶44}** During the direct examination of Thomason, the State objected to a portion of his testimony, arguing that the testimony was information that was not contained in the expert report. At the end of the sidebar addressing the objection, the prosecutor withdrew the objection and then said, "but I don't want to hear he doesn't like all the materials that say you can drop this thing out of a plane, basically, and it won't fire." To which defense counsel responded, "Fine." On cross-examination, the prosecutor posed several troubling questions to Thomason, some of which were not objected to by Raider's counsel. For example, the State asked Thomason without objection whether he was aware that the State of California drops these types of guns out of planes without them discharging. Additionally, Thomason was asked about, and ultimately disagreed with, a statement from a website that indicated that the type of gun at issue "drop[s] safe from a reasonable distance," and that there would have to be "enough force to bend some serious metal before the gun could possibly go off."[1] Raider has not challenged those questions

---

[1] This question was posed twice. Defense counsel objected to it the first time it was asked and the objection was overruled. When the question was revisited later, defense counsel did not renew his objection.

on appeal. We note that part of the reason Raider may have decided not to challenge those questions on appeal is because of the discussion at sidebar mentioned above.

**{¶45}** Here, Raider only challenges one question posed by the prosecutor to Thomason. During cross-examination, the following exchange occurred:

> [Prosecutor:] How about if I told you that before coming in here we dropped a Sig Sauer some 14 times –
>
> [Defense Counsel:] Objection, Your Honor.
>
> [Prosecutor:] – some 14 times, and it didn't go off?
>
> [Thomason:] I would still disagree.
>
> [The Court:] You may not answer the question when there's an objection. You're aware of that, Mr. Thomason. The basis for the objection?
>
> [Defense Counsel:] The tests that the State made should be subject to cross-examination, and –
>
> [The Court:] The objection is sustained.
>
> [Defense Counsel:] – and the declaration –
>
> [The Court:] The objection is sustained. Ask another question, Mr. [Prosecutor].

**{¶46}** After considering this question in the context of the whole trial, we cannot say that Raider has demonstrated that, "but for the prosecutor's misconduct, the trier of fact would not have convicted him." *Miller* at ¶ 22. We have previously set forth the extensive trial testimony which included a substantial amount of evidence that would support Raider's guilt. In addition, any harmful effect of the particular question that Raider challenges on appeal was lessened by other related questions raised by the prosecution that were either not objected to or not challenged on appeal. Accordingly, in light of the foregoing, we cannot say that Raider has demonstrated that he was prejudiced by any improper conduct by the prosecution. *See Brooks,* 2017-Ohio-5620, at ¶ 13. Considering the improper question in the context of the entire trial,

including the other related questions which were unchallenged, Raider has not demonstrated that, in the absence of that one question, he would not have been convicted. *See Pleban,* 2011-Ohio-3254, at ¶ 39; *Miller*, 2015-Ohio-279, at ¶ 22.

**{¶47}** Raider's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT'S ERRONEOUS JURY INSTRUCTION DEPRIVED THE APPELLANT HIS RIGHT TO A FAIR TRIAL UNDER THE STATE AND FEDERAL DUE PROCESS CLAUSES.

**{¶48}** Raider argues in his third assignment of error that the trial court committed reversible error in failing to include Raider's requested instruction concerning accident. Specifically, he contends that the trial court should have included language that "the Defendant had no obligation to prove anything concerning accident[.]" The trial court declined to include the additional language and trial counsel objected. Because this Court concludes that the gist of the requested instruction was covered by the general charge, we cannot say that the trial court abused its discretion.

**{¶49}** "An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. "'[I]t is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge.'" *State v. Sowell,* 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 134, quoting *State v. Scott*, 26 Ohio St.3d 92, 101 (1986). "'However, the trial court need not give the defendant's requested instructions verbatim but may use its own language to communicate the same legal principles to the jury.'" *Sowell* at ¶ 134, quoting *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 108.

{¶50} Near the beginning of the instructions, the trial court informed the jury that, "[t]he Defendant is presumed innocent unless his guilt is established beyond a reasonable doubt. The Defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of every offense that was charged in the indictment." Later in the instructions, in discussing the first count, the trial court provided the following definition of accident:

> The Defendant denies any purpose to cause the death of Brandon Smith. He denies that he committed an unlawful act and says that the result was accidental.

> An accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event out of the usual order of things and not reasonably anticipated as a natural or probable result of a lawful act.

> If, after considering all of the evidence, including that on the subject of accident, you are not convinced beyond a reasonable doubt that the Defendant had a purpose to cause the death of another, you must return a verdict of not guilty.

{¶51} At the beginning of the instructions for each count, the trial court informed the jury that, before it could find Raider guilty of the count at issue, it had to find certain elements beyond a reasonable doubt. At the end of the instructions pertaining to each count, the trial court then instructed the jury that, if the jury found that the State had proven beyond a reasonable doubt all the essential elements of the charged offense, the verdict must be guilty. Whereas, if the jury found that the State failed to prove beyond a reasonable doubt any of the essential elements of the charged offense, the verdict must be not guilty.

{¶52} Given the foregoing instructions, we conclude that the trial court did inform the jury that it was the State's burden to prove the charged offenses and the idea that Raider did not have the burden of proof was covered by the general charge. *See Sowell,* 148 Ohio St.3d 554, 2016-Ohio-8025, at ¶ 134-136. Raider has not pointed to any part of the jury instructions which places the burden of proof on him. Moreover, Raider has pointed to no authority that would

suggest that an additional instruction was required in light of the other instructions provided. *See* App.R. 16(A)(7).

**{¶53}** Raider's third assignment of error is overruled.

## III.

**{¶54}** Raider's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SCHAFER, P. J.
CONCURS.

CALLAHAN, J.
DISSENTING.

{¶55} I respectfully dissent from the majority's resolution of Mr. Raider's second assignment of error. As noted by the majority, the defense presented in this case was that the shooting was the result of an accidental discharge when the gun was dropped. Given that context and reviewing the entire trial, I would find that the information about the gun being dropped 14 times without discharging that was disseminated to the jury through the prosecutor's improper question prejudicially affected Mr. Raider's substantial rights.

{¶56} First, even though defense counsel objected midway through the offending question, the prosecutor, who surely knew better than to continue talking after the objection, pushed forward repeating the number of times the gun allegedly had been dropped. Thus, he made certain the jury heard that the gun was dropped "some 14 times, and it didn't go off."

{¶57} Second, the prosecutor's "question" was not a question at all. Rather, it amounted to unchallenged testimony about an issue that was at the very heart of the matter in this case, namely whether Mr. Raider's Sig Sauer was capable of accidentally discharging if dropped. The defense argued that any "tests that the State made should be subject to cross-examination." Answers to questions such as who was the "we" who dropped the gun, whose Sig Sauer was dropped, under what conditions was it dropped, and in what condition was the Sig Sauer at the time it was dropped, never reached the jurors' ears because defense counsel was unable to conduct a cross-examination on the many issues contained within the prosecutor's "question."

{¶58} The prosecutor, in effect, told the jury that Mr. Raider's defense of accident was an impossibility 14 times over. In view of the fact that "improper suggestions, insinuations, and

* * * assertions of personal knowledge" by the prosecution "are apt to carry much weight against the accused when they should properly carry none," *Berger v. United States*, 295 U.S. 78, 88 (1935), the information interjected by the prosecutor deprived Mr. Raider of a fair trial. This was not a fact of "minor relevance," rather whether the gun could accidentally discharge was the central issue disputed by the parties in the present case. *Contrast Miller*, 2015-Ohio-279, at ¶ 29.

{¶59} Notably, the State called four police officers and a firearms expert from BCI as witnesses—none of whom testified to any such test having been conducted. Surely, if the State had conducted an appropriate test, the results of which it felt were important enough to come before the jury, it could have prepared the requisite expert report and offered a witness to testify to the results, which then could have been subject to cross-examination. Such was not the case here. And it was inappropriate and prejudicial for the prosecutor, using the pretext of a "question," to put information before the jury that was not in evidence. *See State v. Tilley*, 8th Dist. Cuyahoga No. 96756, 2012-Ohio-1533, ¶ 24.

{¶60} "[I]t is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper [question]. Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's [question], the jury would have found [Mr. Raider] guilty." *See Smith*, 14 Ohio St.3d at 15, citing *United States v. Hasting*, 461 U.S. 499, 510-511 (1983). In the present case, I cannot find, beyond a reasonable doubt, that the jury would have found Mr. Raider guilty had there been no misconduct on the part of the prosecution.

{¶61} Consequently, I would sustain Mr. Raider's second assignment of error and find his other assignments of error moot based on that resolution.

APPEARANCES:

DAVID L. DOUGHTEN, Attorney at Law, for Appellant.

KENNETH M. LIEUX, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.